Bertie L. HARDIN

v.

## COMBINED INSURANCE COMPANY OF AMERICA.

Court of Appeals of Tennessee,
Eastern Section.

March 26, 1975.

Certiorari Denied by Supreme Court
Aug. 25, 1975.

S. Morris Hadden, with Hunter, Smith, Davis, Norris & Treadway, Kingsport, for appellant.

David F. Tucker, Jr., with Tucker & Cowan, Elizabethton, for appellee.

## OPINION

SANDERS, Judge.

The Defendant has appealed from a decree of the Chancery Court for the proceeds of a life insurance policy which Defendant refused to pay because of alleged misrepresentations as to medical history.

On February 2, 1970, the Defendant, Combined Insurance Company of America, issued its policy of life insurance on the life of Robert L. Hardin for the sum of $2,400.00. It was a non-medical policy which the agent had authority to issue without a medical examination upon collecting a six-month premium. The policy remained in force until the insured's death on August 19, 1973.

After the death of the insured the Plaintiff, Bertie L. Hardin, as beneficiary, filed a claim for the face amount of the policy, but the Defendant declined to pay on the theory that at the time the policy was issued the insured had made material misrepresentations concerning his prior health and medical care and that such misrepresentations influenced the Defendant's judgment in issuing the policy and materially increased the risk of loss.

The Plaintiff filed suit in the Chancery Court for Carter County and the case was tried by the Chancellor on oral testimony.

The Chancellor found the issues in favor of the Plaintiff and the Defendant has appealed and assigned error.

The Defendant's assignment of error is: "The trial court erred in finding material evidence to support the contentions of plaintiff and in awarding benefits under the life insurance policy in view of the material misrepresentations made by the insured in his Application for Insurance when such application was attached to and made a material part of the policy, and when the medical history and treatment misrepresented, as a matter of law, increased the insurer's risk of loss."

The proof shows that on the day the policy was issued the Defendant's agent, Mr. Chester R. Gillis, went to the home of the Plaintiff and the insured for the purpose of trying to sell both of them a life insurance policy. After some discussion among the agent, the insured and his wife, it was decided that the Plaintiff would take out a policy of insurance on the life of the insured and that she would pay the premium and own the policy.

Before the policy could be issued it was necessary that certain information concerning the insured's health and medical history be furnished and recorded on the policy. In the interview the Plaintiff and/or the insured gave the agent the information concerning the insured's medical history and the agent recorded certain information on the application.

After the application had been filled out it was signed by the Plaintiff. She issued her check to the agent for $70.00 which was for the first six months' premium.

The agent issued to her a policy of insurance on the life of the deceased, with a copy of the application attached.

The provisions of the application for insurance, as pertinent here, are as follows:

"I hereby apply for the above-described policy on the basis of the statement regarding the Insured's health given in Part I of this Application and I hereby further apply for the benefits provided under Section A of the policy on the basis of the information regarding the Insured's health given in Part II of this Application."

\* \* \* \* \* \* \*

"PART I—POLICY QUALIFICATION STATEMENT—READ CAREFULLY.

To the best of my knowledge the Insured has not had any advice or treatment for stroke, heart attack or other heart condition, cancer, or any malignant growth within the last five years.

"PART II—SECTION A QUALIFICATION QUESTIONS.

\* \* \* \* \* \* \*

2. Within the last 5 years, has the Insured consulted a physician for a checkup, physical defect, or for any nervous or mental disorder, injury, or sickness? ............................Yes
3. Does the Insured now have any physical defect, nervous or mental disorder, injury or sickness? ............................Yes
Explain below a 'YES' answer to Questions 2 or 3; ..."

The explanation to Question 2 is shown to be that the insured had a physical examination in December, 1971, but he had no surgery nor was he still under medical treatment.

The only explanation as to the answer of Question 3 was that the insured was a diabetic.

At the bottom of the application, immediately above the signature of the applicant or owner, it says:

"IMPORTANT READ CAREFULLY—I represent and affirm the following:
"A. I have read the statement in Part I of this Application and it is true to the best of my knowledge.
"B. The information I have given as recorded on this Application is true and complete to the best of my knowledge."

\* \* \* \* \* \* \*

Just below this it was executed by the Plaintiff signing the name of the insured.

The application shows that within the past five years the insured had not had any advice or treatment for stroke, heart attack or other heart condition nor did he have any physical defects except being a diabetic.

He had a physical examination in December, 1971, and was not under any medical treatment.

The proof shows this information to be inaccurate and incomplete. The proof shows the insured had been retired from his employment with Beaunit Fibers due to total permanent disability beginning December 29, 1970.

The medical report shows this disability to be due to diabetes mellitus, arteriosclerotic heart disease and glomerulonephritis.

His record at the Carter County Memorial Hospital for the five-year period preceding the application for insurance was as follows:

Admitted Dec. 16, 1967—Discharged Dec. 23, 1967
Final clinical diagnosis: (1) Bilateral Bronchopneumonia
    (2) Diabetes mellitus
    (3) Hypertensive cardiovascular disease, compensated
    (4) Nephritis

Admitted Oct. 20, 1968—Discharged Oct. 25, 1968
Final clinical diagnosis:
    (1) Alcoholic intoxication
    (2) Diabetes mellitus
    (3) Hypertension
    (4) Hypertensive cardiovascular heart disease
    (5) Glomerulonephritis
    (6) Hiatus hernia

Admitted Feb. 11, 1969—Discharged Feb. 15, 1969
Final clinical diagnosis:
    (1) Diabetes mellitus, controlled
    (2) Hypertension
    (3) Hypertensive cardiovascular disease and arteriosclerotic heart disease, compensated.
    (4) Hematuria due to glomerulonephritis and/or pyelonephritis

Admitted Sept. 29, 1969—Discharged Oct. 1, 1969
Final clinical diagnosis:
    (1) Diabetes mellitus
    (2) Arteriosclerotic heart disease and hypertensive cardiovascular disease, compensated
    (3) Glomerulonephritis
    (4) Lumbosacral myositis and degenerative osteoarthrosis of L–4, L–5

Admitted April 12, 1970—Discharged April 15, 1970
Final clinical diagnosis:
    (1) Meniere's syndrome
    (2) Diabetes mellitus
    (3) Hypertension
    (4) Hypertensive cardiovascular disease, arteriosclerotic heart disease, compensated

Admitted Jan. 12, 1971—Discharged Jan. 14, 1971
Final clinical diagnosis:
    (1) Active peptic ulcer disease, duodenum
    (2) Possible lesser curvature gastric ulcer
    (3) Diabetes mellitus
    (4) Hypertension
    (5) Hypertensive cardiovascular disease and arteriosclerotic heart disease, compensated
    (6) Latent glomerulonephritis
    (7) Lumbosacral osteoarthrosis with myositis

Admitted Sept. 16, 1971—Discharged Sept. 18, 1971
Final clinical diagnosis:
(1) Diabetes mellitus
(2) Hypertension and hypertensive cardiovascular disease, compensated
(3) Latent glomerulonephritis
(4) Lumbo sacral degenerative osteoarthrosis
(5) Positive test rheumatoid arthritis
(6) History of peptic ulcer disease
(7) Obesity ·

Admitted March 3, 1973—Discharged March 9, 1973
Final clinical diagnosis:
(1) Bronchopneumonia
(2) Possible mild congestive heart failure
(3) Hypertension & hypertensive cardiovascular disease and arteriosclerotic heart disease with angina pectoris syndrome
(4) Latent glomerulonephritis
(5) History of peptic ulcer disease
(7) Obesity

The death certificate shows the cause of death as cerebral vascular accident due to or as a consequence of hypertension and arteriosclerosis, along with diabetes mellitus, rheumatoid arthritis, glomerulonephritis, arteriosclerotic heart disease, hypertensive cardiovascular disease and bronchopneumonia.

There is a sharp conflict in the testimony of the Plaintiff and that of Mr. Gillis as to what information was furnished by the Plaintiff and the insured at the time the application was filled out. It is the insistence of Mr. Gillis that he recorded on the application all of the medical history that was furnished to him. The Plaintiff, on the other hand, insists that she and her husband made a thorough disclosure of the insured's physical condition and disability. It is the insistence of the Plaintiff that the agent deliberately omitted the information from the application for the purpose of defrauding the company and collecting a commission.

If we accept the theory of the Defendant we will be required to deny recovery since the medical history of the insured would unquestionably increase the risk of loss as set out in T.C.A. § 56–1103. Also, as pointed out by the court in the case of *Sloop v. Mutual of Omaha Insurance Company*, 55 Tenn.App. 656, 404 S.W.2d 265, 268:

" 'It is the duty of the insured when he signs an application or accepts the policy, if he knows or has any reason or ground to believe that he has any disease or is in unsound health, * * * [to] make a fair disclosure of the facts to the insurer. *Knights of Pythias v. Rosenfield [Rosenfeld]*, 92 Tenn. 508, 22 S.W. [204] 504; *Harris v. [Security Mut. Life] Insurance Co.*, 130 Tenn. 325, 170 S.W. 474 [L.R.A. 1915C, 153].' *Norvill v. Mutual Benefit Health & Accident Ass'n*, 14 Tenn.App. 396; *Little v. Washington National Ins. Co.*, 34 Tenn.App. 593, 241 S.W.2d 838."

On the contrary, if we accept the theory of the Plaintiff we are still required to deny recovery under the holdings of the Supreme Court in the case of *DeFord v. National Life & Accident Ins. Co.*, 182 Tenn. 255, 185 S.W.2d 617 and *Beasley v. Metropolitan Life Ins. Co.*, 190 Tenn. 227, 229 S.W.2d 146.

The Plaintiff testified, in part, as follows:

"Q. Mrs. Harden,—what conditions did Mr. Hardin relate to Mr. Gillis, that he had?

"A. Well, he told him that he had high blood pressure and he had a heart condition and he had diabetes and he told him, he said I'm too near a dead man to take out insurance.

"Q. What was Mr. Gillis' reply to this?

"MR. HADDEN: We have continuing objections to the statements.

"THE COURT: She can testify about the agent. That's admissible.

"A. I just don't remember what he did say to him b-ut anyhow he told him that he could take out the policy and it would be due him.

"THE COURT: Now, the agent of the Combined Insurance Company told your husband in your presence that he was the agent and that he could take out an insurance policy and it would be good?

"A. Yes sir.

"THE COURT: Very well. Go ahead.

"Q. After your husband told him all of these conditions, did you know at that time what the agent put on the application?

"A. Well,—I knowed the question he answered, but I didn't know whether he put

yes or no. I didn't know what he put on it, no."

\* \* \* \* \* \*

"Q. And he retired in what year? 70 or 71?

"A. 1970, the last day.

"Q. And he retired for heart trouble, high blood pressure? Is that correct?

"A. And diabetes.

"Q. And diabetes?

"A. And I don't know what else.

"Q. And from the time he retired, of course, up until the time he passed away, he was not able to engage in work of any type was he?

"A. Nothing only help me around the house up there, around the shop.

"Q. Alright. So he had no work once he retired on disability at the plant here did he?

"A. No sir."

\* \* \* \* \* \*

"THE COURT: And that was not kept a secret from the agent that wrote the policy?

"A. No sir it wasn't kept a secret, no.

"THE COURT: Knew all about it and said I'll write it anyway?

"A. He did write it anyway."

\* \* \* \* \* \*

"Q. Okay. The question is, at the time he came he had some policies there and he asked you and your husband questions and he made you . . . he wrote certain questions and you answered them? Is that right?

"A. Yes, but he didn't write them like we answered them."

\* \* \* \* \* \*

"Q. And the policy that was filled out, certain information was taken from you and you signed it and the agent signed it, he actually delivered you a policy there at that time didn't he?

"A. And I never did read it until after my husband died. I put it up."

\* \* \* \* \* \*

"Q. Well, before you signed your husband's name and gave the premium, did you read this to the best of my know-ledge that your husband had not had advice or treatment for stroke, heart attack, or heart condition or cancer or malignant growth within the last five years? Did you read that?

"A. No I didn't read cause we had answered the questions.

"Q. You didn't read that then?

"A. No I didn't read it cause we had set there and answ-ered the questions."

\* \* \* \* \* \*

"Q. And question three says does the insured have any physical defect or nervous or mental disorder, injury or sickness, yes. And when you described you put diabetic. You didn't put the blood pressure and all the other things were not listed in here were they?

"A. We told him but its not on the policy but he was told.

"Q. Well, you had this policy in your possession bearing your signature and Mr. Gillis' signature for about eighteen months before your husband died didn't you?

"A. Yes sir.

"Q. Of course you read the policy and are aware of the fact that the policy was issued and it said in there based on the considerations made in the application? Were you aware of that?

"A. I didn't read it until after he passed away. I never read the policy. I just put it in the drawer."

In both the *DeFord* case, *supra*, and the *Beasley* case, *supra*, the agent knew of the ill health of the insured but put false information on the application, which the insured signed without reading. In each case the court said this barred recovery.

We quote from the record in the *DeFord* case at page 618:

"The defense relied on was a breach of this condition in that the insured was not in sound health at the time of making application for the insurance and was fully aware of it. This is not disputed. He had been suffering for some time with a heart affection complicated by syphilis, for which he had been receiving clinic treatments. But, in response plaintiff relied on waiver of this condition by the agent who solicited the insurance, and invoked the rule of imputed knowledge by the Company.

"On the trial before a jury plaintiff, wife of the insured, supported by another witness, testified that when solicited to take the insurance DeFord informed the agent of the Company that he had 'bad blood,' heart trouble and had been operated on for hernia and that the agent had accompanied Mr. DeFord to the City Hospital where he was accustomed to go to take shots for his blood trouble; but that the agent told DeFord that because of this condition of his health 'he needed it [the insurance] more than ever'; that with this information the agent filled out the applications containing false representations of sound health, DeFord signed them and the policies were procured from the Company and delivered to him. The agent denied all knowledge that Mr. DeFord was in unsound health, or that he had been so informed."

\*    \*    \*    \*    \*    \*

"Overruling a motion for a directed verdict for the defendant, the trial Judge submitted to the jury the question whether or not the evidence sustained the contention of the plaintiff that the agent knew of and, therefore, waived the condi-

tion of sound health, thus conveying notice to and binding the Company. The jury found for the plaintiff. The trial Judge granted a motion for a new trial, sustained defendant's motion for a directed verdict theretofore made and dismissed the suit, and plaintiff appealed."

The Supreme Court affirmed the action of the trial court in directing a verdict for the reasons more specifically given in th‧ *Beasley* case, *supra*.

We quote extensively from the *Beasley* case because it is so much in point with the contention of the Plaintiff in the case at bar.

"In the present case, one Sonnenfield was the agent of the Company, and he had known the Plaintiff and her husband for two or three years prior to the issuance of the policy. He called at Plaintiff's home from time to time, to collect premiums on another policy of insurance and knew the physical condition of Plaintiff's husband. He knew that during that time the insured was seriously ill with high blood pressure and kidney trouble; that he had been hospitalized; that this illness had begun in March, 1947, and continued through June 27, 1947, when the application for insurance was taken."

\*    \*    \*    \*    \*    \*

"The testimony of the Plaintiff is that on the evening of June 27, 1947, she was present in the room with her husband and the agent of the Company when the latter was writing out the answers to the questions on the application; that the agent read out the questions and that her husband answered them truthfully, but that without her knowledge the agent changed the answers to the questions, and that it was not until after the Company had refused to pay the insurance that she knew that the answers to these questions had been changed. She further testified that when the agent had completed the answers, he handed the appli-

cation to her husband, who signed it without reading it. She further testified that when the policy was delivered, she accepted it but did not read it. Thereafter, from time to time, she had seen the agent and paid premiums to him.

"So, at the end of the Plaintiff's proof we have this situation: The answers to the application are admittedly false, but according to the Plaintiff's testimony, neither she nor her husband knew that those answers were false; but it cannot be doubted that if the Company had known that the answers were false, it would never have entered into the contract, nor issued the policy, so much is clear from the language of the documents which are the basis of the contract and which we quoted above in this opinion. Plaintiff says her husband signed the false application but did not read it, though there was no fraud, duress, or disability to prevent his reading it, and the Plaintiff says she herself received the policy when it was delivered, but she did not read it and knew nothing about its falsity until the Company refused to pay the claim.

"[1] The following general rules of the law of contracts are amply supported by authorities cited in American Jurisprudence and Corpus Juris Secundum:

" 'To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts.' 12 Am. Jur., 629. 'In this connection it has been said that one is under a duty to learn the contents of a written contract before he signs it, and that if, without being the victim of fraud, he fails to read the contract or otherwise to learn its contents, he signs the same at his peril, and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence.' 17 C.J.S., Contracts, § 137, pages 489, 490.

" 'It will not do, for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law.' *Upton v. Tribilcock*, 91 U.S. 45, 23 L.Ed. 203; *Berry v. Planters Bank*, 3 Tenn.Ch., 69; *Lockhart v. Moore*, 25 Tenn.App., 456, 466, 159 S.W.2d 438; *Federal Land Bank of Louisville v. Robertson*, 20 Tenn.App. 58, 63, 95 S.W.2d 317.

"[2] The foregoing authorities deal with the phase of the law of contracts where one who has negligently signed a contract without reading it, seeks to avoid his obligation, but clearly the converse would be even more unjust and unreasonable,—that the Courts should impose an obligation, on an innocent Defendant who was led to make the contract on the careless misrepresentation of the Plaintiff and the insured. A verdict should have been directed for the Defendant on account of the misrepresentation and consequent mistake. Therefore, although we think the action taken should have been based on the grounds stated, rather than on the rule of *DeFord v. National Life & Accident Ins. Co.*, supra, the result reached is correct and the judgment is, therefore, affirmed."

Under the holdings in these cases we are compelled to sustain the Defendant's assignment of error.

The decree of the Chancellor is reversed and the case dismissed.

The cost of this appeal, together with the cost in the Trial Court, is taxed to the Appellee.

PARROTT, P. J. (E.S.), and GODDARD, J., concur.