IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 13, 2003 Session

## MITCH G. STOOKSBURY, et al v.
## AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY

**Appeal from the Circuit Court for Anderson County**
**No. A1LA0144      James B. Scott, Judge**

**FILED AUGUST 11, 2003**

**No. E2002-02385-COA-R3-CV**

---

Mitch and Gina Stooksbury ("Plaintiffs") purchased homeowners insurance from American National Property and Casualty Company ("Defendant"). After Plaintiffs' home was destroyed by fire, they were informed by Defendant that their insurance policy had been cancelled prior to the date of loss because of an underwriting risk arising from missing railing on a deck. Defendant claimed to have mailed a cancellation notice and refund check to Plaintiffs in accordance with the terms of the policy. Plaintiffs denied receiving the cancellation notice or refund check. A jury concluded Defendant failed to prove by a preponderance of the evidence that it mailed the cancellation notice to Plaintiffs. The jury also concluded Defendant acted unfairly and in bad faith, and that Defendant's failure to pay the loss was through fraudulent and deceptive practices. The Trial Court entered a judgment for Plaintiffs in the amount of $92,750, for damages pursuant to the insurance contract, plus prejudgment interest on that $92,750. The Trial Court also assessed a 25% bad faith penalty and an additional 5% for punitive damages. Both parties appeal. We affirm the judgment for Plaintiffs in the amount of $92,750 and the prejudgment interest awarded on that $92,750. The bad faith penalty and award of punitive damages is reversed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit**
**Court Affirmed in Part and Reversed in Part; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Janet L. Hogan, Knoxville, Tennessee, for the Appellant American National Property and Casualty Company.

Alvin C. Cooper, Cape Coral, Florida, for the Appellees Mitch G. Stooksbury and Gina Stooksbury.

# OPINION

## Background

Plaintiffs purchased a homeowners insurance policy from Defendant which covered Plaintiffs' home in Heiskell, Tennessee. The policy had an effective date of February 19, 1999, through February 19, 2000. According to the complaint, on June 20, 1999, Plaintiffs' home was destroyed by fire, resulting in losses which Plaintiffs claim exceed the policy limits. Plaintiffs immediately notified Defendant of the fire loss. On July 2, 1999, Defendant notified Plaintiffs via certified letter that their homeowners insurance policy had been cancelled effective May 20, 1999. Defendant claimed a cancellation notice had been mailed to Plaintiffs on April 16, 1999, informing them the policy was cancelled under the "for any reason" provision of the policy due to missing railing on the stairs of a deck. Plaintiffs explained to Defendant that they received neither the notice of cancellation nor a refund of their premium payment. Defendant responded by informing Plaintiffs their policy could be cancelled for any reason upon proof of mailing the cancellation notice. In their complaint, Plaintiffs denied Defendant had adequate proof of such mailing. Plaintiffs further claimed Defendant intentionally misrepresented to them certain terms of the policy. Plaintiffs brought suit pursuant to the Tennessee Consumer Protection Act ("TCPA") for Defendant's alleged unfair and deceptive acts. Plaintiffs also asserted claims for constructive fraud, breach of contract, and bad faith. Plaintiffs sought damages for the loss of their home, personal items, living expenses, etc. They also sought compensatory and/or punitive damages for loss of enjoyment of life, pain and suffering, mental anguish, etc., as well as bad faith penalties and prejudgment interest.

Plaintiffs attached a copy of the homeowners insurance policy to the complaint. In relevant part, the policy provides as follows with respect to Defendant's ability to cancel the policy:

5. **Cancellation**

\* \* \* \*

b. We may cancel this policy only for the reasons stated in this condition by notifying you in writing of the date cancellation takes effect.

This cancellation notice may be delivered to you or mailed to you at your mailing address shown in the **Declarations**. Proof of mailing shall be sufficient proof of notice:

\* \* \* \*

(2) When this policy has been in effect for less than 60 days and is not a renewal with us, we

-2-

may cancel for any reason by notifying you at least ten days before the date cancellation takes effect.

* * * *

c.      When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded on a pro rata basis.

d.      If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

The policy also provides that if Defendant cancels the policy, Plaintiffs' mortgagee will be notified at least ten days before the effective date of cancellation.

Defendant answered the complaint by generally denying any liability to Plaintiffs. Defendant claimed that policy cancellation notices were mailed to Plaintiffs and their mortgagee on April 15, 1999, thereby resulting in an effective cancellation of the policy prior to the date of the fire.

The jury trial began on February 26, 2002. The first witness was Plaintiff Mitch Stooksbury ("Mr. Stooksbury"), a former police officer who was employed as a carpenter at the time of trial. Mr. Stooksbury identified his homeowners insurance policy, its effective date of coverage, as well as the language in the policy quoted above discussing cancellation and refunding of premiums. Mr. Stooksbury stated he financed the purchase of his home through Banc One Financial Services of Tennessee, Inc. ("Banc One"), and was required to maintain homeowners insurance. If he did not maintain such insurance, Banc One would "force place … insurance on it" at a higher rate. According to Mr. Stooksbury, Banc One never informed him the insurance through Defendant had been cancelled and never "forced" replacement insurance at a higher rate.

Mr. Stooksbury testified that immediately after the fire occurred, he called Defendant's toll-free telephone number to report a fire had occurred. Mr. Stooksbury was told he quickly would receive up to $2,000 to help cover replacing necessities. The next day, Mr. Stooksbury spoke with one of Defendant's employees, Ms. Jennifer Homan ("Homan"), who informed him that the policy had been cancelled due to an "underwriting error." When Mr. Stooksbury asked what that meant, he claims Homan stated she was not sure and would look into the matter. Homan nevertheless informed Mr. Stooksbury that Defendant would contact an adjuster and send a cause and origin investigator to Plaintiffs' house. Two days after the fire occurred, Don Lee ("Lee"), who identified himself as an adjuster for Defendant, asked Mr. Stooksbury to sign a "Non-Waiver Agreement," which he did sign. This document authorized Defendant to investigate the fire, etc., while at the same time reserving any and all of Defendant's rights under the policy.

Mr. Stooksbury identified a letter dated June 24, 1999, which Homan sent to him via certified mail. This letter likewise indicated that, while the fire and resulting damage would be investigated, Defendant specifically reserved all of its rights under the policy. The letter also stated that present information indicated "coverage might not exist for you with respect to this incident due to the cancellation of your homeowners policy, effective May 20, 1999, and for other reasons which may become apparent during our investigation." Thereafter, Mr. Stooksbury received a second letter from Homan dated July 2, 1999, informing him that Defendant would not provide any insurance coverage because the policy had been cancelled effective May 20, 1999. Homan enclosed copies of the cancellation notice it claimed was sent to Plaintiffs and Banc One, Defendant's proof of having mailed these notices, as well as a copy of the premium refund check supposedly sent with the cancellation notice. Mr. Stooksbury testified he never received the cancellation notice or refund check. Mr. Stooksbury acknowledged that he was told by Defendant after the fire occurred that the reason the insurance had been cancelled was due to missing railing on a deck. He admitted the railing was missing.

The next witness was Trish Fordyce ("Fordyce"), a litigation specialist for Defendant as well as its corporate representative at trial. According to Fordyce, after receiving the file, she obtained a copy of Defendant's internal documentation showing the cancellation notice on Plaintiffs' policy had been mailed. However, Fordyce admitted she never spoke with anyone with the United States Postal Service ("Post Office") to verify the proof of mailing, nor did she speak with Defendant's employee responsible for generating the internal form which showed the cancellation notice had been mailed. Fordyce identified the portion of the policy which states that proof of mailing shall be sufficient proof of notice. According to Fordyce, a copy of the notice of cancellation also was sent to Banc One.

Fordyce was questioned about Lee's report which was prepared shortly after the fire. According to Fordyce, Lee works for Tenco Services, not Defendant, although he was hired by Defendant to conduct an investigation. Lee's report was maintained by Defendant in its file. Based solely on the contents of Lee's report, Fordyce testified: (1) Defendant was aware both Plaintiffs and Banc One were claiming they never received a copy of the notice of cancellation; (2) Plaintiffs claimed they never received the refund check; and (3) Lee recommended Defendant set aside reserves in the amount of $53,000. Fordyce's testimony about what was contained in Lee's report was admitted over Defendant's numerous hearsay objections as well as a relevancy objection.

Fordyce testified Defendant's records show a refund check for Plaintiffs' unused premium was issued, but its records do not show that this check ever was cashed. The cancellation notices were not sent by certified or registered mail. Defendant does not have a receipt from the Post Office showing the purchase of postage to mail the cancellation notices. Defendant does not have any written guidelines for the mailing of cancellation notices, but copies of the cancellation notices were maintained in Defendant's file as part of its ordinary course of business. The cancellation notices were generated on April 15, 1999, and indicate a refund check in the amount of $130.00 was sent to Plaintiffs. Fordyce identified a form which she claimed showed the cancellation notices were mailed to Plaintiffs and Banc One on April 16, 1999. This document also contains a Post Office

-4-

stamp dated April 16, 1999. The cancellation notice does not contain a signature. Fordyce denied the cancellation notice and proof of mailing could have been created at any time by one of Defendant's employees.

The next witness was Carl Dreitlein ("Dreitlein"), who was formerly employed by Defendant and who assisted Plaintiffs' with their application for homeowners insurance. Dreitlein testified he went to Plaintiffs' home to complete the application, as well as to obtain Plaintiffs' signatures and a check for the premium. Dreitlein identified a document titled Comprehensive Loss Underwriting Exchange which was dated February 5, 1999. One of Dreitlein's obligations was to visually observe various aspects of the house. He made notations on this document regarding the missing railing on the back deck. Dreitlein acknowledged the reason given by Defendant for cancelling Plaintiffs' policy was this lack of railing. If Dreitlein received a cancellation notice on a policy he wrote, he would contact the insured to make sure they were aware of the cancellation. He never received a notice of cancellation regarding Plaintiffs' homeowners insurance policy. However, on cross-examination Dreitlein acknowledged he was no longer employed by Defendant on April 16, 1999, the day on which Defendant claims to have mailed the cancellation notice. Dreitlein also admitted that a lack of railing on a deck was an underwriting risk and a homeowner could be sued if someone fell from a deck for this reason.

Plaintiff Gina Stooksbury ("Mrs. Stooksbury") testified the fire occurred at 2:00 a.m. on June 20, 1999. According to Mrs. Stooksbury, she never received a notice of cancellation from Defendant prior to the date of the fire. Likewise, she never received a refund check for the unused premium. Mrs. Stooksbury never was informed by Defendant or Banc One that the insurance had been cancelled. Mrs. Stooksbury admitted the policy states Defendant can cancel the policy for any reason within 60 days.

Defendant's first witness was Richard Bryant ("Bryant"), who is employed by Defendant as an underwriting manager. According to Bryant, the proof of mailing utilized by Defendant is standard procedure. Likewise, the cancellation notice sent to Plaintiffs was the standard notice issued by Defendant's underwriting department. Bryant identified the notice of cancellation pertaining to Plaintiffs' homeowners insurance which was maintained by Defendant in the ordinary course of business. He acknowledged Plaintiffs' policy required Defendant to have proof of mailing of the cancellation notice. Bryant then described the process of how a policy is cancelled by Defendant's underwriting department. According to Bryant, Defendant creates a list of insureds who are having their policies cancelled and this mailing list is stamped by the Post Office. Bryant identified the cancellation list which contained Plaintiffs' names as well as that of Banc One. The procedure used to cancel Plaintiffs' policy was the same procedure used by Defendant since Bryant began employment with Defendant twenty-four years ago. Bryant testified he knows the process regarding cancellation of policies, and when the cancellation notices are mailed, Defendant obtains a Post Office stamp on the mailing list. Bryant admitted he was not involved with Defendant's mail room.

Defendant's next witness was Donna Evans ("Evans"), who worked for Defendant as a mail specialist during the relevant time. As a mail specialist, Evans opened all of the underwriting mail and sent out cancellation notices. The proof of mailing for the various cancellation notices mailed on April 16, 1999, was maintained by Defendant on microfilm. Evans testified that on April 16, 1999, she received the notices of cancellation, placed them in an envelope, and matched them one by one against the names on the list. According to Evans, she placed Plaintiffs' cancellation notice and their refund check in an envelope. She also mailed a cancellation notice to Banc One. After the cancellation notices were placed in envelopes, Evans took the envelopes and the mailing list to Defendant's mail room. The next time she saw the mailing list was when it was returned to her with a Post Office stamp on it. There were actually two stamps on the list; one from Defendant's postage meter and another from the Post Office. Evans did not personally place postage on the envelopes containing the cancellation notices as that function was handled by employees in the mail room. On cross-examination, Evans testified she did not have any specific recollection of placing Plaintiffs' notice of cancellation in an envelope, but she knows she did because their name was on the list. Evans did not place postage on the envelopes containing the cancellation notices, did not see who did, and has no personal knowledge that the cancellation notices contained on the list actually were mailed. Evans has no knowledge of what transpired in the mail room after the cancellation notices were taken there.

The next witness was Roger Fuhr ("Fuhr"), Defendant's mail room supervisor. Fuhr testified there are approximately 3,500 to 5,000 incoming pieces of mail per day, and approximately 14,000-16,000 outgoing pieces of mail. Fuhr identified the cancellation notice list for April 16, 1999. According to Fuhr, the mail room receives the cancellation notices and the list toward the end of each day. Once the cancellation notices are actually received, proper postage is placed on the envelopes and all of the mail is taken to the Post Office. The Post Office then places a stamp on the mailing list, which is then returned to the underwriting department. Fuhr did not speak with anyone who was working in the mail room on April 16, 1999, to see if they recalled mailing the cancellation notices to Plaintiffs or Banc One. Fuhr did not mail the notices himself. Fuhr testified he did not know whether the Post Office stamp was verification of an individual mailing to Plaintiffs. Fuhr acknowledged he could not verify that the Post Office actually received a specific piece of mail.

Plaintiffs called Sheila Kirton ("Kirton") as a rebuttal witness. Kirton is employed in Knoxville by the Post Office as a "mail piece design analyst and supervisor over business mail entry and mailing requirements." Kirton has been employed by the Post Office for twenty-seven years. Kirton testified she was familiar with what the Post Office considers to be proof of mailing for businesses, including bulk mailings. When asked what options were available to a company that generated over 100 pieces of mail a day and needed to prove mailing, Kirton stated:

> [W]e have several different programs; certified mail, which, of course, the recipient has to sign for so you know they have received it; certificate of mailing, which just proves that you mailed a piece of mail. And because I'm in bulk mail, in business mail, then you have got a certificate of bulk mailing, which just proves that you made a

mailing. Not what was in the mailing, just that you made a mailing
that day.

When asked what she would recommend to a business which needed to prove it mailed a specific piece of mail, Kirton responded she would recommend:

Either the certified mail or the certificate of mailing, and for a large number of pieces, they you can use a firm mailing book, which lists all of the pieces of mail in a particular mailing.…If you are doing it on an individual basis they are 60 cents a piece. If you are doing it with a firm mailing book in bulk, they are 30 cents a piece.

According to Kirton, the Post Office stamp on Defendant's mailing list in the present case is called a "round date stamp", and it does not prove whether or not the individuals on the list actually had something mailed to them.

On cross-examination, Kirton testified that to her knowledge, the law of Tennessee does not require use of any particular type of mailing. Her previous testimony was intended to explain the various Post Office services an individual or company can utilize. Use of the Post Office's certificate of mailing (which was not used by Defendant in the present case) would not prove what was actually in the envelope, but it would prove that something actually was mailed to the addressee.

After closing arguments were completed and jury instructions given by the Trial Court, the jury retired initially to consider one question, that being whether Defendant had proven by a preponderance of the evidence that the notice of cancellation was mailed to Plaintiffs in accordance with the policy provisions. The jury answered this question in the negative. In light of the jury's answer to the first question, they were then given two more questions to answer, and thereafter found by a preponderance of the evidence that Defendant's failure to pay the policy loss was through fraud and deceptive practices, and Defendant's failure to honor the policy was done unfairly and in bad faith.

Once the jury returned its verdict answering the three questions, the parties stipulated that Plaintiffs' damages under the policy totaled $92,750, and the jury was excused.[1] Further argument was heard by the Trial Court regarding Plaintiff's remaining claims and additional damages. The Trial Court concluded Plaintiffs failed to state a claim for constructive fraud or emotional distress and dismissed these claims. The Trial Court then allowed further testimony from Mr. Stooksbury about additional damages allegedly incurred as a result of Defendant's bad faith refusal to pay on the claim. After hearing this testimony, the Trial Court concluded Plaintiffs were

---

[1] Defendant stipulated to the maximum limits under the policy, which was broken down as follows: $53,000 for the dwelling, $26,500 for personal property, $10,600 for loss of use, and $2,650 for shrubbery and trees.

entitled to additional damages because of Defendant's bad faith refusal to pay the claim and assessed the penalty at 25% of the $92,750, or $23,187.50. Finally, the Trial Court awarded Plaintiffs an additional 5%, or $4,637.50, as punitive damages under the TCPA. The Trial Court did not award Plaintiffs treble damages or attorney fees under the TCPA, concluding the 25% bad faith penalty was sufficient for Plaintiffs to pay their attorney fees.

Defendant appeals raising numerous issues. Although not exactly stated as such, Defendant claims the Trial Court erred in allowing testimony by Plaintiffs that they did not receive the cancellation notice. Defendant also claims the Trial Court erred in allowing testimony of alternative methods for mailing which were not required by the insurance contract or Tennessee law. Next, Defendant claims that had the above evidence properly been excluded, it would have been entitled to a directed verdict and, therefore, the Trial Court erred when it refused to grant its motion for a directed verdict. Finally, Defendant maintains the Trial Court erred when it allowed the jury to consider bad faith, punitive damages, and pre-judgment interest because Defendant had a good faith belief it had cancelled the insurance contract pursuant to its terms and Tennessee law.

Plaintiffs also raise numerous issues on appeal. They claim the Trial Court's dismissal of their claim for constructive fraud was error. They also claim the Trial Court erred in "determining that incidental, consequential and other damages and costs were not available to [Plaintiffs] or relevant for consideration in their claims for breach of contract, bad-faith, constructive fraud and violations of the Tennessee Consumer Protection Act." Next, Plaintiffs claim the 5% award of punitive damages and no award of attorney fees was inadequate as a matter of law under the TCPA. Finally, they claim the Trial Court erred when it refused to allow Lee's investigative report to be admitted for consideration of damages.[2]

## Discussion

We will begin by addressing the evidentiary issues raised by Defendant which challenge the admission of certain evidence at trial. When arriving at a determination to admit or exclude evidence, a trial court is generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion. *Otis v. Cambridge Mutual Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992).

Defendant claims Plaintiffs' testimony that they did not receive the cancellation notice was irrelevant to the issue of whether the notice was mailed. Defendant primarily relies on *Cherokee Ins. Co. v. Hardin*, 202 Tenn. 110, 302 S.W.2d 817 (1957). In that case, the defendant Cherokee Insurance Company ("Cherokee") insured the plaintiffs' automobile. After the automobile was damaged, Cherokee informed the plaintiffs that their insurance policy had been cancelled prior

---

[2] Several other potential issues are mentioned in the argument sections of the parties' briefs. These issues are not, however, contained in the "statement of the issues presented for review" sections of their briefs. *See* Tenn. R. App. P. 27(a)(4) and (b). Therefore, we will not consider these potential issues to have been "presented for review" and will limit the issues discussed in this Opinion to those issues actually presented for review or which are closely related thereto.

to the date of loss. The plaintiffs claimed they never received the cancellation notice. As in the present case, the insurance policy provided that proof of mailing the cancellation notice was sufficient proof of notice. A trial was conducted and the jury returned a verdict in favor of the plaintiffs, concluding the notice had not been mailed. The trial court entered judgment accordingly, and this Court affirmed that judgment. The Tennessee Supreme Court granted *certiorari* because of its "grave doubt" as to whether there was any material evidence to support the jury's verdict. *Cherokee*, 202 Tenn. at 112, 302 S.W.2d at 818. In discussing the facts regarding the mailing which took place in that case, the *Cherokee* Court stated:

> After receipt of claim of the Hardins following the wreck, there was found in, and taken from, the files of the Cherokee Insurance Company carbon copy of the notice, properly addressed, to Mr. and Mrs. Hardin of the cancellation of this policy. Attached thereto was the official receipt of the Post Office at Nashville acknowledging receipt by it *for transmission to Mr. and Mrs. Hardin* of mail which the uncontradicted proof shows to have been the original of the carbon copy notice in the files of the Cherokee Insurance Company, where an endorsement on the back thereof showed it had been since shortly after date of the notice.

> An average of twenty notices of this character or having to do with some phase of this insurance business are mailed out each day. These notices are placed by the insurance clerk who prepares them in the outgoing desk mail basket. They are picked up in due course by the porter who carries them to the Post Office for delivery. He procures the post office official acknowledgment of receipt of *each letter* for which a receipt is requested. He brings this receipt back to the desk of this insurance clerk, and it is by her attached to the copy notice which is then placed in the files of the Insurance Company.

*Cherokee*, 202 Tenn. at 113, 302 S.W.2d at 818-19 (emphasis added). The only proof in the record that the cancellation notice had not been mailed by Cherokee was the plaintiffs' denial of receipt. One of the issues to be decided by the Court was whether the plaintiffs' denial of receipt was material evidence that the notice had not been mailed. *Cherokee*, 202 Tenn. at 115, 302 S.W.2d at 819. The Court concluded that it was not, stating:

> To say that by reason of a presumption that the Post Office performs its official duty, therefore, that the testimony of the addressees that they did not receive this letter creates a permissible inference that the letter was never mailed in spite of the unimpeached, uncontradicted, written, official acknowledgment of the Post Office that it received *this letter* for transmission by mail to the addressees is, in the opinion

of this Court, to assert that which is thoroughly unconvincing and unsound.

*Cherokee*, 202 Tenn. at 117-118, 302 S.W.2d at 820 (emphasis added).

In the present case, relying on *Cherokee*, Defendant argues Plaintiffs' denial that they received the cancellation notice simply is not relevant and, therefore, inadmissible on the issue of whether it was mailed. We disagree. In *Cherokee*, the insurance company obtained from the Post Office an official acknowledgment of receipt *for each letter*. In other words, the defendant could prove a letter was mailed specifically to the plaintiffs. That is not what happened in the present case. Here, Defendant simply had a mailing list stamped by the Post Office. This round date stamp does not verify that a piece of mail actually was sent to any particular person identified on the mailing list. Thus, while the round date stamp by the Post Office certainly was some evidence of a mailing to Plaintiffs, it does not rise to the level of conclusiveness as did the Post Office proof of mailing present in *Cherokee*. It is not "unimpeached, uncontradicted, written, official acknowledgment of the Post Office that it received *this letter*," being the cancellation notice sent to Plaintiffs. *See Cherokee*, 202 Tenn. at 117-118, 302 S.W.2d at 820 (emphasis added).

Because of the conclusive nature of the proof of mailing in *Cherokee*, our Supreme Court concluded the plaintiffs' denial of receipt in light of this conclusive proof was unconvincing and unsound. Here, the issue is different. We must decide whether the Trial Court abused its discretion in admitting testimony by Plaintiffs that they did not receive the cancellation notice in the absence of *conclusive* proof of mailing from the Post Office. Tenn. R. Evid. 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Since Defendant did not present conclusive proof that Plaintiffs' cancellation notice was mailed, we believe Plaintiffs' testimony that they never received the cancellation notice has a tendency to make the existence of a fact that is of consequence to this action (i.e., whether or not the cancellation notice was mailed) more or less probable than it would be without such evidence. Therefore, we conclude the Trial Court did not abuse its discretion when it admitted this testimony over Defendant's relevancy objection, and affirm the Trial Court on this issue.

Next, Defendant argues the Trial Court erred when it admitted the testimony of Kirton, a twenty-seven year Post Office employee who described the various mailing options available to Defendant and other companies. In *Otis v. Cambridge Mutual Fire Ins. Co.*, 850 S.W.2d 439 (Tenn. 1992), the Court offered the following guidance with regard to expert witnesses and their testimony:

Tennessee Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence

> or to determine a fact in issue, a witness qualified as an expert by knowledge skill, experience, training, or education may testify in the form of an opinion or otherwise.
>
> To give expert testimony, one must be particularly skilled, learned or experienced in a science, art, trade, business, profession or vocation. The expert must possess a thorough knowledge upon which he testifies that is not within the general knowledge and experience of the average person. *Kinley v. Tennessee State Mutual Insurance Co., Inc.*, 620 S.W.2d 79, 81 (Tenn. 1981). The trial judge has wide discretion in the matter of the qualifications of expert witnesses. *Blalock v. Clairborne*, 775 S.W.2d 363 (Tenn. App. 1989), citing *Stokes v. Leung*, 651 S.W.2d 704, 706 (Tenn. App. 1982).

*Otis*, 850 S.W.2d at 443.

Defendant requested and was given an opportunity to *voir dire* Kirton outside of the presence of the jury and does not challenge on appeal her qualifications as an expert. After the *voir dire* was completed, the Trial Court concluded Kirton's testimony "could give us guidance and the Jury guidance as it relates to the issues …." At trial and on appeal, Defendant argues that the "round date stamp" on the mailing list is conclusive proof that the cancellation notice was mailed to Plaintiffs. Plaintiffs, on the other hand, minimize the value of the round date stamp, arguing it proves virtually nothing. Kirton testified the "round date stamp" relied upon by Defendant did not verify whether or not any particular individual on the mailing list actually had something mailed to him or her. She further testified to the services offered by the Post Office which would verify that a piece of mail actually was mailed to a particular individual, such as certified mail or a certificate of mailing. Kirton's testimony distinguished the round date stamp relied on by Defendant from other Post Office methods which do show that a particular individual had something mailed to him or her on that specific day, something the round date stamp does not do. In our opinion, Kirton's testimony would substantially assist the jury to understand the evidence or determine a fact in issue, in particular the meaning and effect of the round date stamp. *See* Tenn. R. Evid. 702. Accordingly, we hold the Trial Court did not abuse its discretion when it held this testimony was admissible.

The next issue presented by Defendant is its claim that the Trial Court erred when it failed to direct a verdict in its favor "when proof of notice of cancellation was established under the contract by a post office stamped proof of mailing …." In deciding whether a trial court was correct in granting or denying a motion for directed verdict, an appellate court cannot weigh the evidence.

> Rather, it must take the strongest legitimate view of the evidence in favor of the plaintiff, indulging in all reasonable inferences in his favor, and disregarding any evidence to the contrary. The trial judge's action [granting a motion for directed verdict] may be sustained only if there is no material evidence in the record that would support a

verdict for the plaintiff, under any of the theories that he has advanced.

*Wharton Transport Corp. v. Bridges*, 606 S.W.2d 521, 525 (Tenn. 1980) (quoting *Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn.1978)).

To resolve this issue, we must determine if the Trial Court was correct when it overruled Defendant's motion for directed verdict, thereby implicitly concluding there was material evidence that would support a verdict for Plaintiff. In light of the non-conclusive effect of the "round date stamp" as discussed at length above, coupled with other evidence such as Plaintiffs' testimony that they never received the notice of cancellation, we conclude there is material evidence in the record to support a verdict for Plaintiffs regarding whether or not the cancellation notice was mailed. Therefore, the Trial Court correctly overruled Defendant's motion for directed verdict.

After the jury concluded Defendant failed to prove by a preponderance of the evidence that it had mailed the notice of cancellation in accordance with the policy provisions, the parties stipulated that Plaintiffs' contractual damages under the policy totaled $92,750.00. The Trial Court approved this stipulation, and we hereby affirm that portion of the Trial Court's judgment awarding Plaintiffs a judgment in the amount of $92,750.00.

Before we resolve the remaining issues on appeal, we will address Defendant's argument that the practical effect of the jury's verdict and the Trial Court's judgment is to require it to use certified mail when mailing cancellation notices, a result which is required neither by Tennessee law nor the insurance policy. At trial, Defendant presented proof to support its position that the cancellation notice had been mailed, and the jury quite easily could have ruled for Defendant on this key issue. Our function on appeal, however, is not to reweigh the evidence, but to determine if there is any material evidence to support the verdict on this issue. As already discussed, we found there is. Our affirming the jury's verdict that Defendant did not prove it mailed the notice in no way *requires* Defendant to mail cancellation notices by certified mail. A requirement of this sort is a matter better left to the Tennessee Legislature as opposed to the court system. Defendant is certainly at liberty to continue using the method currently employed by it when mailing cancellation notices, unless the Legislature directs otherwise at some time in the future. However, by not using certified mail or another form of mailing which rises to the level of conclusive proof of mailing as in *Cherokee*, Defendant creates the risk that its insured may be able to present a factual issue for the jury on whether or not a cancellation notice actually was mailed. It is entirely up to Defendant to determine its cost-benefit analysis of using a conclusive Post Office proof of mailing method versus regular mail.

The next issue raised by Defendant concerns the Trial Court's award of a 25% bad faith penalty and an additional 5% as punitive damages. Defendant claims that at a minimum it had a good faith belief Plaintiffs' policy had been properly cancelled and, therefore, the Trial Court erred in awarding these damages. Plaintiffs contend the amount of damages awarded by the Trial Court

-12-

for bad faith and punitive damages are altogether inadequate. Plaintiffs further claim they should have been awarded attorneys fees under the TCPA.

The jury concluded Defendant's failure to pay under the policy was fraudulent and deceptive and Defendant acted unfairly and in bad faith. We will review what Plaintiffs contend to be evidence of Defendant's bad faith and fraudulent acts in order to determine if there is material evidence to support this portion of the jury's verdict.

At trial, a New Business Work Sheet was admitted into evidence. This document was received by Defendant on March 9, 1999. On March 16, 1999, a representative of Defendant noted on this document that the policy was being referred to the underwriting department. There is a section on this document for the underwriting department to indicate its final decision. This section was left blank. At trial, Bryant testified this particular document would not necessarily show what ultimate decision was made by the underwriting department. The document does, however, show that the underwriting associate was making notes about the various risks of insuring Plaintiffs. Thereafter, on April 16, 1999, the notice of cancellation was generated indicating the policy was being cancelled because of a lack of railing.

Plaintiffs contend that because the space on the March 1999 New Business Work Sheet indicating the ultimate decision by the underwriting department was left blank, the "logical conclusion" is that the notice of cancellation was "generated after the loss to support a claim denial."[3] We do not believe this conclusion is in any way logical and find it to be totally unsupported by the evidence. There is no proof in the record from which it reasonably could be inferred that Defendant created the cancellation notice after the date of loss. There is, however, the testimony of Fordyce wherein she denied that the cancellation notice and proof of mailing could have been created at any time by one of Defendant's employees.

Plaintiffs argue that after the fire occurred, Defendant "failed to disclose having to actually prove mailing, failed to disclose having to refund premium and made no disclosure of having to actually notify the named Mortgagee to have an effective cancellation." Based on these claimed failures, Plaintiffs argue it "can be reasonably inferred that during the investigation, [Defendant] calculated that [Plaintiffs] would not financially be able to sustain a lawsuit and calculated that [Plaintiffs] would not be able to understand the subtleties of the Policy."

In *Giles v. Allstate Ins. Co.*, 871 S.W.2d 154 (Tenn. Ct. App. 1993), this Court stated that if, without being the victim of fraud[4], a party:

---

[3] Plaintiffs likewise argue that because this space on the March 1999 New Business Work Sheet was left blank, the policy *never was* cancelled. We fail to see how the blank space on this one March 1999 document means Defendant never could have cancelled the policy at any later time utilizing other documentation.

[4] Plaintiffs make no allegation of fraudulent conduct on the part of Defendant when the insurance contract was entered into, and there is no proof in the record to support such an allegation.

fails to read the contract or otherwise to learn its contents, he signs the same at his peril and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence. *Beasley v. Metropolitan Life Ins. Co.*, 190 Tenn. 227, 229 S.W.2d 146 (1950) at 148. *Also see DeFord v. National Life & Accident Ins. Co.*, 182 Tenn. 255, 185 S.W.2d 617, 621 (Tenn. 1945); *Hardin v. Combined Insurance Company*, 528 S.W.2d 31 (Tenn. App. 1975); *Montgomery v. Reserve Life Ins.*, 585 S.W.2d 620 (Tenn. App. 1979).

*Giles*, 871 S.W.2d at 156. This principal recently was reaffirmed by this Court in *Tennessee Farmers Mutual Ins. Co. v. Westmoreland*, No. E2000-02693-COA-R3-CV, 2001 Tenn. App. LEXIS 398 (Tenn. Ct. App. May 30, 2001), *appl. perm. appeal denied Nov. 5, 2001.*

Plaintiffs obviously contend the contract of insurance is valid inasmuch as they sought, were awarded, and we have affirmed the full amount of damages available to them under the terms of the contract. Plaintiffs do not argue the contract of insurance expresses an agreement different from what they bargained for. Plaintiffs do not claim Defendant expressly misrepresented how the policy could be cancelled. Rather, they claim that after the fire occurred, Defendant failed to detail the exact requirements for cancellation, thereby resulting in "deceitful impl[ications]" and fraud. Plaintiff Mitch Stooksbury admitted he possessed a copy of the contract, and in fact this very same copy survived the fire and was admitted into evidence at trial.

In light of the facts and the applicable law, we believe Plaintiffs must be "conclusively presumed" to have known the contents of the policy, including the plain and unambiguous section setting forth when and how Defendant could cancel the policy. We conclude Defendant's alleged failure to detail exactly when and how it could cancel the policy under the contract cannot support a claim of bad faith or fraud when Plaintiffs are conclusively presumed to have known the contents of their contract with Defendant.

The statute upon which Plaintiffs sought and were awarded a 25% bad faith penalty is Tenn. Code Ann. § 56-7-105(a), which provides as follows:

> The insurance companies of this state … in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond;

-14-

and provided further, that such additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

Tenn. Code Ann. § 56-7-105(a) is penal in nature and must be strictly construed. *See Minton v. Tennessee Farmers Mut. Ins. Co.*, 832 S.W.2d 35, 38 (Tenn. Ct. App. 1992). In order to recover bad faith penalties under this statute, a claimant must prove: (1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith. *Minton*, 832 S.W.2d at 38 (citing *Palmer v. Nationwide Mutual Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986)). The burden of proving that an insurance company acted in bad faith in refusing to pay a claim lies with the insured. *See Nelms v. Tennessee Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978). In *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844 (Tenn. Ct. App. 1982), this Court explained that:

> The bad faith penalty is not recoverable in every refusal of an insurance company to pay a loss. *An insurance company is entitled to rely upon available defenses and refuse payment if there is substantial legal grounds that the policy does not afford coverage for the alleged loss. If an insurance company unsuccessfully asserts a defense and the defense was made in good faith, the statute does not permit the (sic) imposing of the bad faith penalty.*

*Sisk*, 640 S.W.2d at 852 (emphasis in original)(quoting *Nelms v. Tennessee Farmers Mutual Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978)).

The jury's verdict on this issue can be set aside only if there is no material evidence to support it. Tenn. R. App. P. 13(d); *Forrester v. Stockstill*, 869 S.W.2d 328, 329 (Tenn. 1994). A verdict cannot, however, be based upon a "mere spark, glimmer, or scintilla of evidence." *See Sadek v. Nashville Recycling Co.*, 751 S.W.2d 428, 431 (Tenn. Ct. App. 1988). We have thoroughly reviewed the record in this case and have already discussed the vast majority of the evidence upon which Plaintiffs rely in making their claim of bad faith. Quite simply, the inferences which Plaintiffs derive from this evidence are unreasonable and, at times, irrational. For example, Plaintiffs repeatedly claim the documents showing their policy had been cancelled were not generated by Defendant until after the fire occurred and not until Defendant somehow discovered it could easily take advantage of Plaintiffs. There is absolutely no evidence in the record to support such a claim; not even a spark or glimmer, much less any material evidence.

We believe Defendant had substantial legal grounds supporting its position that Plaintiffs' insurance coverage had been cancelled prior to the date of loss. Defendant simply unsuccessfully asserted the defense that the notice of cancellation had been mailed, and we find no

material evidence that this defense was made in bad faith. We, therefore, conclude there is no material evidence to support the jury's verdict that Defendant's refusal to pay under the policy was done in bad faith. Accordingly, we reverse the judgment of the Trial Court insofar as it awards Plaintiffs a bad faith penalty of 25%. *See Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844, 852 (Tenn. Ct. App. 1982)("There were substantial legal grounds, though not sustained, for the insurer to defend herein. Therefore, we believe the finding of bad faith must be overturned."); *Nelms v. Tennessee Farmers Mutual Ins. Co*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978)(Reversing the jury's award of a 25% bad faith penalty after concluding there were "valid reasons for the insurance company to question the loss. Further, we think the insurance company honestly and in good faith believed … its policy was not liable for the loss. For the above reasons we think there is no material evidence to support a finding of bad faith and the invoking of the statutory penalty.").

Relying on the jury's conclusion that Defendant's refusal to pay on the policy was the result of fraud and deceptive practices, the Trial Court awarded punitive damages of 5%, totaling $4,637.40. These punitive damages were awarded pursuant to the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.* Defendant argues on appeal that the award of punitive damages was error. Plaintiffs argue they are entitled to significantly more damages, including treble damages and attorney fees pursuant to the TCPA, as well as punitive damages in the amount of $1,800,000 for fraud.

The stated purpose of the TCPA is to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." Tenn. Code Ann. § 47-18-102(2). The applicability of the TCPA to insurance companies was recently discussed by our Supreme Court in *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920 (Tenn. 1998). In *Myint*, the plaintiffs brought suit after Allstate refused to pay on a claim due to the suspicious nature of the cause of two fires which ultimately resulted in substantial damage to the plaintiffs' property. It was stipulated by the parties that both fires were set intentionally, but the plaintiffs steadfastly denied that they set the fires. *Id.* at 923. The main issue to be decided by the Supreme Court was whether the TCPA was applicable to insurance companies. The Court held that it was, concluding the legislature intended the TCPA to be complementary to other statutes regulating the insurance industry. After reaching this result, the Court then decided whether the denial of the plaintiffs' insurance claim constituted a violation of the Act. The Court stated:

> While the sale of a policy of insurance easily falls under this definition of "trade" and "commerce," we conclude that Allstate's conduct in handling the Myints' insurance policy was neither unfair nor deceptive. The record reveals no evidence of an attempt by Allstate to violate the terms of the policy, deceive the Myints about the terms of the policy, or otherwise act unfairly. It is apparent that the denial of the Myints' claim was Allstate's reaction to circumstances which Allstate believed to be suspicious. Consequently, Allstate's conduct does not fall within the purview of

the Tennessee Consumer Protection Act, and the Myints are not entitled to the benefits of treble damages and attorney's fees recoverable under the Act.

*Myint*, 970 S.W.2d at 926.

For the same reasons we concluded there was no material evidence to support the jury's conclusion that Defendant acted in bad faith, we likewise conclude there is no material evidence to support the jury's conclusion that Defendant engaged in deceptive or unfair acts. As in *Myint*, Defendant's conduct in denying Plaintiff's claim does not fall within the purview of the Tennessee Consumer Protection Act. There being no material evidence to support a verdict that Defendant violated the TCPA, Plaintiffs are not entitled to treble damages, attorney fees, or any other form of damages they claim are available to them under the Act, such as incidental and consequential damages. We reverse the Trial Court's award pursuant to the TCPA of 5% in punitive damages.[5]

Plaintiffs request this Court to "enhance" the judgment and grant them an additional $1,800,000 in punitive damages based on Defendant's alleged fraud. In Tennessee, punitive damages can be awarded only upon a finding that a defendant "acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). Since punitive damages are awarded only in "the most egregious of cases," a plaintiff must prove entitlement to punitive damages by clear and convincing evidence. *Id.* Having already concluded there is no material evidence that Defendant engaged in such conduct, we decline to "enhance" the judgment, assuming for present purposes only that we even have the power to do so. We also conclude there is no material evidence to support Plaintiffs' claim for constructive fraud, and affirm the Trial Court's dismissal of this claim.

Finally, we address Defendant's claim that the Trial Court erred when it awarded Plaintiffs prejudgment interest. An award of prejudgment interest is within the sound discretion of the trial court and will not be disturbed on appeal unless the record reveals a "manifest and palpable" abuse of discretion." *Myint*, 970 S.W.2d at 927. Thus, a trial court has "considerable deference in the prejudgment interest decision." *Id.* In *Myint*, the Court discussed at length the various principles to be considered when awarding prejudgment interest. After reviewing these principles, we conclude the Trial Court's decision to award prejudgment interest was an equitable decision, and Plaintiffs could not be fully compensated without such an award. We also find the Trial Court correctly determined prejudgment interest should begin to run on July 2, 1999, the day on which Defendant first denied Plaintiffs' claim. *See Myint*, 970 S.W.2d at 929. Finding no manifest and palpable abuse of discretion, we affirm the Trial Court's award of prejudgment interest. Any remaining issues are pretermitted.

---

[5] Neither party raised the issue of whether punitive damages are available under the TCPA. *See Concrete Spaces Inc. v. Sender*, 2 S.W.3d 901 (Tenn. 1999). Given our conclusion that there was no violation of the TCPA, we need not address this issue.

## **Conclusion**

We affirm the judgment of the Trial Court insofar as it awards Plaintiffs $92,750 in contractual damages pursuant to the insurance policy. We affirm the Trial Court's award of prejudgment interest and its dismissal of Plaintiffs' claim for constructive fraud. We reverse the award of a 25% bad faith penalty and the award of 5% in punitive damages. In all other respects, the judgment of the Trial Court is affirmed. This cause is remanded to the Trial Court for further proceedings as are required consistent with this Opinion, if any, and for collection of the costs below. Exercising our discretion, costs on appeal are taxed to the Appellant, American National Property and Casualty Company, and its surety.

 

 

_____
D. MICHAEL SWINEY, JUDGE