## TENNESSEE FARMERS MUT. INS. CO.

v.

## Gerald FARRAR.

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Dec. 3, 2008 Session.

April 30, 2009.

Rehearing Denied May 20, 2009.

Permission to Appeal Denied by Supreme Court Feb. 16, 2011.

Thomas Crutchfield, Chattanooga, Tennessee, for the appellant, Gerald Farrar.

Michael R. Campbell and Kathryn M. Russell, Chattanooga, Tennessee, for the appellee, Tennessee Farmers Mutual Insurance Company.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and JON KERRY BLACKWOOD, SP. J., joined.

This case involves an alleged misrepresentation on an application for a policy of homeowners' insurance ("the policy"). Following a fire, the applicant—the defendant Gerald Farrar ("the Claimant")—filed a claim with the insurer, Tennessee Farmers Mutual Insurance Company ("the Company"), seeking $92,043 for smoke and fire damage. The Company declined the claim and brought a declaratory judgment action. Following a bench trial, the court held, as particularly pertinent to this appeal, (1) that the Claimant had made a non-intentional misrepresentation on the application, but one that increased the Company's risk of loss and voided the policy; (2) that the Company was not estopped to assert the Claimant's misrepresentation; (3) that the Claimant was bound by the representations in the application and could not rely upon the fact that he did not read the application when he signed it; and (4) that Gary Vollheim, an occupant in the house and the one who started the fire, was not an insured. The trial court declared the policy void *ab initio* and dismissed the Claimant's counterclaim. He appeals. We affirm.

## I.

The Claimant's house was insured under a policy of homeowners' insurance issued by the Company. The structure was damaged by fire on June 22 or 23, 2006.[1] The Company denied coverage based upon an alleged misrepresentation on the Claimant's application for the policy. It subsequently filed a declaratory judgment suit against the Claimant seeking a declaration of the parties' rights under the policy.

## II.

The Claimant had lived in the house since 2001. He initially shared the residence with Roy Vollheim and his son, Gary Vollheim. Gary Vollheim had been disabled since the 1960s and had a history of alcoholism and mental illness. When the Claimant first moved into the house, Roy Vollheim owned the property. The property had been insured by the Company for a number of years. When Roy Vollheim died, Gary Vollheim inherited the property.

After Roy Vollheim's death, and consistent with his wishes, Gary Vollheim quitclaimed the property to the Claimant, retaining a life estate. Thereafter, the Claimant paid all of the household expenses, including taxes, utilities, and repairs. Following Roy Vollheim's death, the Claimant and Gary Vollheim continued to live in the house.

Sometime after Roy Vollheim's death, the Claimant and Gary Vollheim made an appointment to see Michael Dyer, an agent of the Company, for the purpose of advising him of Roy Vollheim's death. The Claimant told Mr. Dyer that he wanted to obtain a new insurance policy covering the house. The Claimant testified that he brought copies of tax records for the property as well as his copy of the deed to the meeting. The tax records and the deed show that Gary Vollheim quitclaimed the property to the Claimant, retaining a life estate. All agree that Gary Vollheim was present at the meeting.

Mr. Dyer, as the agent for the deceased, had the old policy number. During the meeting, Mr. Dyer filled out an application for insurance. Mr. Dyer asked the questions on the application form and wrote down the Claimant's answers. Question 13 asked, "[Does] [a]ny other party have an ownership or other interest, of any type, in this property?" The application reflects the Claimant's answer as, "No."

The Claimant testified that he told Mr. Dyer that Gary Vollheim had a life estate. The Claimant stated that, "[Mr. Dyer] asked does your ex-wife have any interest in the property or does anybody else have any interest in the property other than you and Gary right here?" The Claimant also testified that he told Mr. Dyer that the living conditions in the house had not changed—that he and Gary both were still living in the house. Mr. Dyer testified that he does not remember what the Claimant brought with him to the meeting and that he does not remember the specifics of the conversation with him, except for what he wrote down on the application. After the meeting, the Company issued an insurance policy on the house and its contents. A year later, the policy was renewed. The insured's name on the renewal certificate is reflected as "Gerald B. Farrar," i.e., the Claimant.

In June 2006, the Claimant was an over-the-road truck driver. While the Claimant

---

1. The trial court concluded the fire occurred on June 22, 2006, and that the investigation of the fire took place on June 23, 2006. The Company's brief recites that the fire occurred on June 23, 2006. The Claimant's brief states that it occurred in June 2006. In the context of the issues on appeal, there is no need to firm up the correct date.

was away, Gary Vollheim intentionally cut his wrists. A neighbor, Ronald Mills, testified that on the night of Gary Vollheim's death, Mr. Vollheim called him at 12:30 a.m. According to Mr. Mills, Mr. Vollheim was agitated about some letters. Mr. Mills, who lived in close proximity to Mr. Vollheim, told him that they would talk the next morning.

The next day, in the morning, Mr. Mills walked out of his house to get the newspaper. As he walked down his driveway, he saw that there was blood "all over the back of my pickup truck." He returned to his house and "called [his] next door neighbor across the street." When the neighbor arrived, they followed a trail of blood leading from the truck up to and onto the porch of the Claimant's house. They did not go any further but instead decided to call the sheriff's department. When an officer arrived, he discovered a fire in the house and called the fire department. When the fire department arrived, the fire was out, but the firemen found Gary Vollheim dead on the side porch of the house. Lacerations to Mr. Vollheim's wrists were consistent with suicide. A suicide note was found on the kitchen table.

The experts that investigated the scene said that papers were piled in a hallway and set on fire. An expert for the Company, Stephen Ale, testified that the fire began in two locations, but the Rhea County Fire Department investigator, Charles Kinney, found only one initiation point for the fire. Both witnesses said that the fire went out because there was no ventilation in the house. Mr. Ale said that lamp oil had been used to ignite one of the piles of letters but there was no evidence of lamp oil on the other. Further, there was no evidence that an accelerant had been spread around the house or used to light the letters. Because the fire burned itself out, most of the damage was smoke-related. The damage was significant.

### III.

The Claimant raises the following issues by the two questions posed in the "Issues" section of his brief:

1. Did the Claimant make a material misrepresentation on his application for a homeowners' insurance policy?

2. Assuming there was a material misrepresentation, is the Company estopped to assert same as a defense to the Claimant's claim under the policy?

In its brief, the Company responded to these issues and raised two of its own:

1. Should a witness for the Company on the subject of underwriting have been permitted to testify regarding the differences between the application in this case and an application involved in an unrelated decision of this Court?

2. Is the claim in this case barred by a provision in the policy excluding coverage for "any action, other than accidental, committed by or at the direction of any insured: (a) resulting in a loss or (b) with the intent to cause a loss"?

### IV.

Our review is *de novo* upon the record of the proceedings below; however, that record comes to us with a presumption that the trial judge's factual findings are correct. Tenn. R.App. P. 13(d). We must honor this presumption unless we find that the evidence preponderates against the court's factual findings. Tenn. R.App. P. 13(d); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn.1984). Our review of the trial court's conclusions on matters of law, while also *de novo*, is without a presumption of correctness. *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn.2005). Furthermore, we review the trial court's application of law to the facts *de novo*, with no presumption

of correctness. *Clark v. Clark*, No. M2006–00934–COA–R3–CV, 2007 WL 1462226, at \*3 (Tenn.Ct.App. M.S., filed May 18, 2007).

Trial courts, unlike appellate courts, are able to observe witnesses as they testify and to assess their demeanor and other indices of credibility. Thus, trial courts are in a unique position to evaluate witness credibility. *See Bolin v. State*, 219 Tenn. 4, 405 S.W.2d 768, 771 (1966). Accordingly, appellate courts will not re-evaluate a trial court's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn.1999), *Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315–16 (Tenn.1987).

## V.

### A.

As previously noted, question 13 on the policy application asks, does "[a]ny other party have an ownership or other interest, of any type, in this property?" The answer was, "No." The Company argues that this response is a material misrepresentation because it fails to show that Gary Vollheim had a life estate in the property. The trial court stated:

> Now, there was a question then of whether there was intentional misrepresentation of [sic] fraud. I believe from all of the evidence I would have to find that there is no evidence of intentional misrepresentation or fraud....
>
> However, regarding the ownership, the facts are a little more clear. If Gary [Vollheim's] ownership interest had been known, additional information would have been required according to the testimony of a representative for [the Company] and the rating would've been different. And, therefore, the company representative said the knowledge about

Gary [Vollheim's] right under a life estate to have possessory interest to the exclusion of a remainder interest would've increased the risk of loss.

\* \* \*

> If the writing had included what was on the deed, I think we wouldn't be here today and so I think based upon Tennessee Code Annotated 56–7–103, the misrepresentation although not intentionally [sic], did materially increase the risk of loss because [the Company] did not have full disclosure of the ownership interest of Gary [Vollheim].

The statute mentioned by the trial court, Tenn.Code Ann. § 56–7–103 (2008), provides as follows:

> No written or oral misrepresentation or warranty made in the negotiations of a contract or policy of insurance, or in the application for contract or policy of insurance, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless the misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

Tenn.Code Ann. § 56–7–103 (2008).

██ As his initial argument, the Claimant asserts that his response to question 13 was true. He states that, *at the time of the loss*, Mr. Vollheim had committed suicide and, therefore, his life estate had been extinguished; thus, according to the Claimant, he was the owner of the property free and clear of Mr. Vollheim's life estate. This misses the point. The issue is whether the representation was true *when made*. Since Mr. Vollheim died *after* the application was signed, the timing of his demise is not material to the issues at hand. To the extent that some of the Claimant's arguments are premised upon the immaterial time of Mr. Vollheim's

death, these arguments will not be discussed in this opinion.

■ Next, the Claimant argues that the representation on the application omitting Gary Vollheim's life estate was not made with an actual intent to deceive. The trial court made a finding "that there is no evidence of intentional misrepresentation or fraud." The evidence does not preponderate against this factual finding by the trial court. Thus, the Company cannot defeat the claim by relying upon that part of Tenn.Code Ann. § 56–7–103 (2008) providing that no misrepresentation "shall be deemed material or defeat or void the policy or prevent its attaching, unless the misrepresentation or warranty is made with actual intent to deceive, . . ." The trial court did not rely upon this part of the statute nor do we.

■ Finally, the Claimant argues that the "Vollheim" misrepresentation did not increase the Company's risk of loss. "A misrepresentation increases the risk of loss when it is of such importance that it 'naturally and reasonably influences the judgment of the insuror in making the contract.'" *Sine v. Tennessee Farmers Mut. Ins. Co.*, 861 S.W.2d 838, 839 (Tenn. Ct.App.1993) (citing *Seaton v. Nat. Grange Mut. Ins. Co.*, 732 S.W.2d 288, 288–89 (Tenn.Ct.App.1987)). When there is a misrepresentation, the question of whether it increases the risk of loss is a question of law for the court. *Id.* (citing *Broyles v. Ford Life Ins. Co.*, 594 S.W.2d 691, 693 (Tenn.1980)). The burden is on the insurer to establish a misrepresentation defense. *McDaniel v. Physicians Mut. Ins. Co.*, 621 S.W.2d 391, 393 (Tenn.1981). *See also Womack v. Blue Cross and Blue Shield*, 593 S.W.2d 294, 295 (Tenn.1980).

In the *Sine* case, the answers on the insurance application regarding the title to the property, the amount of the mortgage and prior insurances loses, were all false.

*Sine*, 861 S.W.2d at 839. This Court held in *Sine* that the misrepresentations increased the risk of loss. *Id.* In support of that holding we stated that "[a] misrepresentation as to the title to the property has been held sufficient to defeat a recovery on an insurance policy." *Id.* (citing *Alfred v. Bankers' and Shippers' Ins. Co.*, 167 Tenn. 278, 280, 68 S.W.2d 941, 942 (1934) (representation by part owner that he was sole owner); *Hughes v. Home Ins. Co.*, 8 Tenn. App. 292, 298, 1928 WL 2113, at *4 (1928) (representation by owner of undivided interest that he was sole owner); *Payne v. Eureka–Security Fire & Marine Ins. Co.*, 173 Tenn. 659, 662, 122 S.W.2d 431, 432 (1938)). In an early case, the Supreme Court held, "These authorities are decisive of the question, and establish beyond a doubt that, if the insured, at the time of his insurance, represents his interest in the property to be greater than it is, the policy is void, and this *whether the misrepresentation be the result of ignorance or design.*" *Catron v. Tennessee Ins. Co.*, 25 Tenn. 176, 183, 1845 WL 1891, at * 5 (1845) (increase of risk in misrepresentation case) (emphasis added).

■ Taken together, *Sine* and the cases upon which it relies establish, as a general proposition, that a misrepresentation regarding the ownership of property is material and increases the risk of loss. In this case, the Company went further and presented evidence from its underwriting department that the misrepresentation as to ownership, in fact, increased the risk of loss. "[C]ourts frequently rely on the testimony of insurance company representatives to establish how truthful answers by the proposed insured would have affected the amount of the premium or the company's decision to issue the policy." *Estate of Howard v. First Cmty. Bank of East Tennessee*, No. 2007–02391–COA–R3–CV, 2009 WL 499541, at *11 (Tenn.Ct.App.

E.S., filed February 27, 2009) (citations omitted). But evidence that the insurer would not have issued the policy had the truth been disclosed is not necessary. *Loyd v. Farmers Mut. Fire Ins. Co.*, 838 S.W.2d 542, 545 (Tenn.Ct.App.1992).

In this case, the Company asserts that it—or any insurer—has a right to know the identity of the person or persons who own an interest in the property. The Company's witnesses clearly demonstrated that had Gary Vollheim's life estate been known, he would have been required to complete a form entitled "Additional Named Insured Application for Insurance" and the form would have been submitted to the Company's home office for evaluation. Mr. Vollheim is dead and we cannot speculate as to what additional information the Company might have obtained had he filled out the form. The point, however, is not what he might have answered; the point is that because the life estate was not disclosed, the Company never had an *opportunity* to ask him questions so it might evaluate the risk associated with the dual ownership interests of the Claimant and Mr. Vollheim. As a holder of a life estate, Gary Vollheim had the right to possession and enjoyment of the property to the exclusion of Mr. Farrar. *See Sherrill v. Bd. of Equalization*, 224 Tenn. 201, 452 S.W.2d 857, 858 (1970). As the Company puts it, "Based on [the Claimant's] application, [the Company's] Underwriting Department had no knowledge that the right to present possession and enjoyment of [the property] was actually vested in Gary Lee Vollheim, a man that [the Claimant] described as mentally ill, an alcoholic, and a paranoid schizophrenic."

The Company's Assistant Vice President for Property Underwriting, Harvey McKay, testified as follows:

Q. All right, sir. In order for [the Company] to evaluate insurability and risk of loss, what does [the Company] need to know about if there are life estates in the property?

A. Generally speaking, we are going to ask questions of all the owners that are—you know, who has the life estate? Who is actually going to occupy the property? We want to know, No. 1, who they are. And once we have identified those parties to determine appropriate coverages, insurability, we're going to go through and ask questions on the application for each of the owners.

Q. And are issues about ownership and right to possession including life estates, are those issues material to [the Company] in terms of its risk of loss?

A. I believe they are, yes.

In a fire loss case that involved a misrepresentation relating to the title to the land on which the insured building was located, the Supreme Court looked to whether the misrepresentation put the insurer in a position of having assumed a greater risk that the one [it] had contracted for. *Payne*, 122 S.W.2d at 432–33. The Court stated: "Generally speaking, insurances against fire are made in the confidence that the assured will use all the precautions to avoid the calamity insured against, which would be suggested by his interest." *Id.* at 433 (citations omitted). "The extent of this interest *must always* influence the underwriter in taking or rejecting the risk or in estimating the premium." *Id.* (citation omitted) (emphasis added). "[S]howing that the insurer was denied information that it, in good faith, sought and deemed necessary to an honest appraisal of insurability is sufficient to establish the grounds for an increased risk of loss." *Smith v. Tennessee Farmers Life Reassurance Co.*, 210 S.W.3d 584, 590 (Tenn.Ct.App.2006) (citations omitted).

We affirm the trial court's holding that, under Tenn.Code Ann. § 56–7–103, the

failure to disclose Gary Vollheim's life estate increased the Company's risk of loss.

## B.

 The Claimant argues that Tennessee Farmers should be estopped from asserting the non-disclosure of the life estate on the application. He relies upon *Molloy v. City of Chattanooga*, 191 Tenn. 173, 232 S.W.2d 24 (1950). "[T]he 'vital principle' of [the] doctrine [of equitable estoppel] is that 'he who by his language or conduct leads another to do' what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted.'" *Id.* at 26 (quoting *Saylor v. Trotter*, 148 Tenn. 359, 367–68, 255 S.W. 590, 593 (1923)). The trial court held, on this point, as follows:

> The burden of proving the agent for [the Company] misled Mr. Farrar in giving an incorrect answer would be on Mr. Farrar. And I think based upon the proof that is presented to me or has been presented to me, that he's not met this burden. Essentially it's his word against Mr. Dyer's, plus the written application.

The Claimant argues that the trial court erred in holding that he had the burden of proof. He argues that the burden of proof of a misrepresentation defense is on the insurer. *See, e.g.*, *McDaniel*, 621 S.W.2d at 393 (citing *Womack v. Blue Cross and Blue Shield*, 593 S.W.2d 294, 295 (Tenn. 1980)). We agree that the Company had the burden of showing there was a misrepresentation in the application, but the burden of proving an affirmative defense is on the party asserting it. *Assoc. of Owners of Regency Park Condos. v. Thomasson*, 878 S.W.2d 560, 566 (Tenn.Ct.App.1994) (citing 11 Tenn. Jur. *Evidence* § 50 (1984)). The trial court correctly placed the burden of proof of the affirmative defense of estoppel on the Claimant, and we do not find that the evidence preponderates against the court's factual determination that he did not carry his burden. Our decision is made stronger when viewed in the light of the case of *Giles v. Allstate Ins. Co., Inc.*, 871 S.W.2d 154 (Tenn.Ct.App.1993). In *Giles*, Allstate asserted that when Ms. Giles signed an application for homeowners' insurance she failed to disclose that she had sustained a previous fire loss and that the insurance company had refused to renew her policy. *Id.* at 155. Ms. Giles claimed she told the insurance agent these facts, and he claimed she did not. *Id.* The trial court resolved the issue in favor of Ms. Giles, but held that its finding was not controlling because Ms. Giles had signed an incorrect application. *Id.* at 155–56. Ms. Giles claimed that the agent wrote down incorrect answers and that she should not be denied coverage because she signed the application without reading it. *Id.* This Court said:

> The same issue has been before the courts in this jurisdiction in numerous cases and they have consistently held: "That if, without being the victim of fraud [the insured] fails to read the contract or otherwise to learn its contents, he signs the same at his peril and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence."

*Id.* at 156 (citing *Beasley v. Metro. Life Ins. Co.*, 190 Tenn. 227, 232–33, 229 S.W.2d 146, 148 (1950)). *Also see De Ford v. Nat'l Life & Accident Ins. Co.*, 182 Tenn. 255, 265, 185 S.W.2d 617, 621 (1945); *Hardin v. Combined Ins. Co.*, 528 S.W.2d 31, 37 (Tenn.Ct.App.1975); *Montgomery v. Reserve Life Ins.*, 585 S.W.2d 620, 622 (Tenn. Ct.App.1979). The *Giles* court explained further, saying,

To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts.

\* \* \*

It will not do, for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law.

*Giles,* 871 S.W.2d at 157 (citations and quotations omitted). *Giles* has been extensively cited. *See, e.g., Reno v. SunTrust, Inc.,* No. E2006–01641–COA–R3–CV, 2007 WL 907256, at \*3 (Tenn.Ct.App. E.S., filed March 26, 2007); *Staubach Retail Services–Southeast, LLC, v. H.G. Hill Realty Co.,* 160 S.W.3d 521, 525 (Tenn.2005).

In this case the Claimant testified that he signed the insurance application. He said, "I read over it briefly, probably not as well as I should've. But I read—I read and saw that all the blanks were filled in." Later when asked if he looked at the question in dispute, he said, "I didn't specifically just look at that question. I just—I didn't reread every question in the thing before I signed it. I just looked and saw that all the blanks were filled in." In this case the application also contained an acknowledgment above the signature line that provides: "I (We) have read all of the above page of this application and the 'Applicant's Additional Remarks Form' (if used), and acknowledge that they supersede all informal understandings or oral agreements relating to this offer to purchase insurance." When asked if he read the acknowledgment, the Claimant said, "I probably read it but I didn't—I just didn't note it."

■ In this case, the Claimant did not read the application before signing it, except to see that all the blanks were filled in. Furthermore, he admits that he did read the acknowledgment which states that he read the application and acknowledges that the application supersedes all informal understandings or oral agreements. We thus hold that the Claimant's signature binds him as a matter of law to the representations in the signed document and he may not now attempt to rely upon alleged oral statements to or by the insurance agent to avoid the effects of his own negligent failure to read the application. *See Beasley,* 190 Tenn. at 232–33, 229 S.W.2d at 148. We affirm the trial court's dismissal of the Claimant's counterclaim.

C.

Mr. Farrar relies on the case of *Ray v. Tennessee Farmers Mut. Ins. Co.,* No. W1999–00698–COA–R3–CV, 2001 WL 91948 (Tenn.Ct.App. W.S., filed February 1, 2001). In *Ray,* the court specifically distinguished a number of cases, including *Giles. Id.* at \*5. We have concluded that *Giles* is controlling in the circumstance presented by this case. We do not think that *Ray* is relevant authority; therefore, we have no reason to reach the evidentiary issue raised by the Company concerning whether the trial court erred in excluding evidence from the Company's underwriter, McKay, regarding the differences between the Farrar application and the application in the *Ray* case.

D.

■ The Company argues that Exclusion 8 of the policy also bars Mr. Farrar from recovery. The provision excludes:

Any action, other than accidental, committed by or at the direction of an **Insured:**

a. resulting in a loss; or

b. with the intent to cause a loss.

(Bold print in original.) The Claimant argues that the trial court did not decide this issue. We disagree. The trial court stated:

> There was another issue about the fact that it should be declined-should not be paid because the loss was other than accidental. As I understand the policy, that would have to have been something caused by the insured, and I find that Mr. Farrar was not the cause of the fire and not responsible so that provision would not apply.

We affirm the trial court's holding that the Claimant was the insured and the court's implicit finding that Gary Vollheim was not an insured. Furthermore, we hold that the evidence does not preponderate against the court's factual finding that "Mr. Farrar was not the cause of the fire. . . ." Because there was no evidence that the fire was started "by or at the direction" of the Claimant, who was the insured, we affirm the trial court's holding that Exclusion 8 is not applicable to the facts of this case. Obviously, our finding against the Company on this point has no impact on our holding that the policy is void *ab initio*.

### VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Gerald Farrar. This case is remanded to the trial court for enforcement of the court's judgment and for the collection of costs assessed below, all pursuant to applicable law.

### OPINION AND ORDER ON PETITION FOR REHEARING

The appellant Gerald Farrar has filed a petition for rehearing pursuant to the pro-

visions of Tenn. R. App. P. 39. He contends, under subsection (a)(3) of the rule, that the Court, in its opinion, "overlook[ed]" two material facts. First, the appellant argues that we overlooked language on the application signed by the appellant reciting that "information and answers" on the application were being furnished "on behalf of all applicants and residents of the household." We did not overlook this fact. This language does not change the fact that Gary Vollheim's life estate was not reported on the application despite a question which should have elicited this information. The language on the application, upon which the appellant relies, does not, in any way, convert a clear misrepresentation into an accurate representation.

The appellant also contends that we overlooked the fact that it is was the intention of Mr. Vollheim's father, and the understanding of the parties, that Mr. Vollheim, while possessing a life estate, was not to exclude the remainderman-the appellant-from remaining on the property during Mr. Vollheim's lifetime. Our response to this is that the recorded deed reflects a life estate in Gary Vollheim *without restriction*. This means that, as a matter of law, he had all the rights of a life tenant, including the right to exclusive possession. This is what we said and this was an accurate statement. It is not contrary to the record before us.

The petition for rehearing is DENIED with costs on appeal associated with the petition taxed to the appellant and his surety.

IT IS SO ORDERED.