# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 30, 2010 Session

## CECILIA OWENSBY, ET AL. v.
## STATE FARM FIRE AND CASUALTY COMPANY, ET AL.

Appeal from the Circuit Court for Cocke County
No. 26,803-IV    O. Duane Slone, Judge

No. E2008-01763-COA-R3-CV - FILED SEPTEMBER 15, 2010

Cecilia and Charles Owensby had a homeowners insurance policy issued by State Farm Fire and Casualty Company ("State Farm"). After their house burned down, the Owensbys filed a claim pursuant to the policy. State Farm eventually denied the claim, asserting that Cecilia Owensby had made four material misrepresentations when applying for the insurance and that each of these misrepresentations increased State Farm's risk of loss. The plaintiffs asserted that any inaccurate information contained on the application was the fault of the insurance agent who filled out the application on Cecilia Owensby's behalf. The plaintiffs sued both State Farm and Darius Miller ("Miller"), the insurance agent. State Farm and Miller filed a motion for summary judgment, which the Trial Court granted. The plaintiffs appeal the grant of summary judgment. We modify the judgment of the Trial Court and, as modified, affirm the grant of summary judgment to the defendants.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
### Circuit Court Affirmed as Modified: Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

P. Richard Talley, Dandridge, Tennessee, for the Appellants, Cecilia and Charles Owensby.

Dallas T. Reynolds, III, Knoxville, Tennessee, for the Appellees, State Farm Fire and Casualty Company and Darius H. Miller.

## OPINION

## Background

This lawsuit was filed by Cecilia Owensby[1] against State Farm claiming State Farm refused to pay pursuant to a homeowners insurance policy after Plaintiff's house burned down. Plaintiff also sued Darius Miller, the insurance agent who assisted Plaintiff with the application for insurance. According to the complaint:

> [Plaintiff] suffered a home-owners fire on or about November 29, 1999. At the time of that fire, [Plaintiff] had in effect a policy of homeowners insurance with the Defendants, State Farm and Miller and . . . Defendants have refused to honor [Plaintiff's] properly filed claim. . . .

> On or about April 7, 1997, Plaintiff . . . paid consideration to the Defendants of an initial partial premium of Four Hundred Three Dollars ($403.00) for comprehensive home-owners coverage and made subsequent installment payments and was issued a standard policy of homeowners insurance . . . on [Plaintiff's] residence . . . in Newport, Cocke County, TN . . . . The residence was owned in fee, subject to a mortgage . . . .

> On or about November 29, 1999, [Plaintiff's] residence and personal effects located within, and insured for such casualty by the Defendants, burned to the ground. After an investigation by the Newport Fire Department and the Federal Bureau of Investigation, as well as others, no firm cause for the fire has been determined other than "probably having come from the hot water heater" or "unknown". . . . At the time of the fire, the insurance premiums were paid in full . . . .

> [Plaintiff] duly notified Defendants of [the] loss and damages, all of which were caused by fire. [Plaintiff has] properly furnished Defendants with a notice of proof of loss . . .

---

[1] The insurance policy was taken out by Cecilia Owensby. Her husband, Charles Owensby, also is a plaintiff. For ease of reference only, when we refer to "Plaintiff" in the singular, we are referring solely to Cecilia Owensby.

[and has] performed each and every condition . . . required by the terms of the policy . . . . [The] loss from the fire, upon information and belief, exceeds Six Hundred Thousand Dollars ($600,000). . . .

Defendants have failed and refused, and continue to fail and refuse, to honor the claim made by the [Plaintiff] in accordance with and under the terms of the policy afore-mentioned. (original paragraph numbering omitted)

Plaintiff further alleged that when applying for insurance with State Farm, she advised Miller of certain prior claims and losses as well as the status of the insurance with her previous carrier. Plaintiff then claimed that Miller negligently filled out the application by omitting information he had been told by Plaintiff. Plaintiff asserted that it was this information that she had told Miller about, and which he did not include on the application, that was relied upon by State Farm to deny her claim based upon alleged misrepresentations. Plaintiff requested Defendants be held liable for a bad faith penalty, which Plaintiff claims was made worse by the fact that State Farm renewed the policy after her house burned down and then unilaterally cancelled the policy. Plaintiff sought specific performance under the contract as well as compensatory damages. Plaintiff also alleged a violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*, and sought treble damages and attorney fees pursuant to that statute.

Defendants answered the Complaint and denied any liability to Plaintiff. State Farm alleged that because of material misrepresentations made by Plaintiff when filling out the application for insurance, it was within its contractual rights to deny coverage under the policy. State Farm added that each of these various misrepresentations increased the risk of loss. State Farm acknowledged accepting a premium payment from Plaintiff after the fire had occurred, but averred that this took place before a final decision was made to deny coverage. Once the final decision was made to deny the claim, all premiums were refunded to Plaintiff. As an additional defense, State Farm averred that it already had paid the balance on Plaintiff's mortgage pursuant to the policy, that the amount it paid totaled $220,383.23, and that it was entitled to a credit in that amount if Plaintiff recovered a judgment.[2]

After undertaking discovery, Defendants filed a motion for summary judgment. The basis for the motion was that Plaintiff allegedly made four material misrepresentations

---

[2]The amount of the returned premiums totaled $6,232.20. Plaintiff has refused to cash the check refunding the premiums. Apparently, State Farm also sent Plaintiff a check for $30,000 towards the loss of the contents of the house. This check was cashed.

when applying for the insurance and that each of these misrepresentations increased the risk of loss. According to the motion, the application signed by Plaintiff on April 1, 1997, indicated that she had not had any losses, insured or otherwise, within the three year period prior to her applying for insurance. State Farm maintained that this was false in that Plaintiff shot someone in October of 1994 and, as a result of that shooting, Plaintiff's homeowner's insurance carrier at that time, American Commerce Insurance Company ("ACIC"), paid a total of $35,000 to settle a lawsuit filed by the person whom Plaintiff shot. The second alleged misrepresentation involved a claim reported to ACIC in January 1997 that lightning had caused damage to Plaintiff's property, resulting in ACIC paying Plaintiff $515 for the property damage. The third misrepresentation alleged to have been made by Plaintiff involved a claim she made to ACIC in March 1995 for damage to her home as a result of a sewer backing up. No money was paid to Plaintiff for this loss because the amount of damage was lower than her deductible.

The fourth and final alleged misrepresentation involved Plaintiff's representation on the application for insurance that within the past three years, no insurer had refused to renew similar insurance. According to State Farm, Plaintiff had missed a payment on her insurance with ACIC and was advised in March 1997 that ACIC had opted not to renew her policy. The specific question on the application asked Plaintiff whether "any insurer or agency canceled or refused to issue or renew similar insurance to the named applicant . . . within the past three years," to which Plaintiff responded "no."

State Farm attached Plaintiff's sworn statement as an exhibit to its motion for summary judgment. As relevant to this appeal, Plaintiff stated that her house burned down once before and it was rebuilt and completed in 1988. The new home was much nicer than the previous home. This new home burned down in 1997. As to the application for insurance at issue in this appeal, Plaintiff acknowledged signing the application. Plaintiff also stated:

> A.  [T]he one [filled out by Mr. Miller], when he filled it out for me, I wasn't even there. I just went in and signed it that day, that morning. I called him and told him I needed some insurance and he filled it out, and I went in and signed it. I had worked all night, I think, and went in and signed it that morning before I went home.

* * *

-4-

Q. [The application says, has] the applicant had any losses insured or not within the past three years? It's checked no.

A. True.

Q. Did you tell Mr. Miller that? Did he ask you that question and you tell him that?

A. No. To be truthful about it, he didn't ask me that question. Like I said, he had this filled out all before I came. I glanced over it and, like I say, I don't remember exactly what all was on it. And I signed it and hit the door. . . .

Q. Okay. My question to you is did Darius Miller ask you the question, Has any insurer – let me start over. Has the applicant had any insurance – any losses, insured or not within the past three years? Did he ask you that question?

A. No.

Q. Did you tell him no in response to that question?

A. I don't remember him asking me the question.

Q. All right. There's a difference. Are you saying he didn't ask you the question, or you have no memory of his asking you the question?

A. I have no memory of him asking me the question.

Q. So you cannot say that he did not ask you the question. You are saying you simply don't remember whether he did or not?

A. I'd just about swear he did not ask me the question because, like I told you . . . I come in and signed it

because I remember that day. I wasn't in the office five minutes.

Q. All right. Let me finish my question. If you'd answer my question, then you can explain it all you want to. My question to you is are you saying that he [did not] ask you this question or you have no memory of him asking you this question?

A. I'd say he did not ask me the question.

Q. Okay. So you're saying he did not ask you that question?

A. No, sir.

Q. Okay. Did he ask you the question, has any insurer or agency canceled or refused to issue or renew similar insurance to the named applicant or any household member within the last three years? And it's checked no. Did he ask you that question?

A. No.

Q. He didn't ask you that question?

A. No.

Q. All right. How did he know to check no?

A. I don't know. He's knowed me all my life. He knows everything about me, I reckon. Like I said, I did not fill out none of this. . . . I don't remember him asking me none of these questions.

Q. All right. Well, I'm going through them. . . . It says year purchased, 1987; did he ask you that question?

A. He might have asked me that on the telephone, but not after I got there.

-6-

\* \* \*

Q. So you are saying he asked you none of these questions?

A. No. Not as I remember, not unless it would be on the telephone. He might have asked me some of them over the phone. . . .

Q. Did he ask you over the telephone about your being refused insurance or canceled?

A. No. Now, that, I don't remember.

Q. You don't remember, or, no, he didn't. . . .

A. No. He did not ask me.

Q. Okay. Did he ask you over the telephone whether or not you had had any losses, whether insured or not within three years?

A. No. I guess he knowed if I had anything. Like I said, I didn't even read this. When I signed it, I signed it and went on.

Q. Well, isn't it a fact you did have losses within three years; didn't you? . . . You shot somebody in '94.

A. That's what I'm trying to think about how many years back that was. It was in '94. It was in October – '94, '93. I didn't think about it being, you know, considered in my house. Yeah, I shot somebody. It was an accident. . . .

Q. Where were you when you shot him?

A. At his house in his driveway.

Q. And you were charged with that?

A.    That's where it is tricky. . . . But yes . . . I was. I had to go to court two or three times [and eventually it was expunged], it's not even on my record.

Q.    You were sued over it?

A.    Uh huh. . . .

Q.    So your insurance company settled out of court?

A.    Yes, sir. . . . I think he got thirty-five thousand dollars. . . . The insurance company wanted it settled. . . . I [didn't] want to settle.[3]  (footnote added)

Plaintiff went on to explain that in 1997, her insurance premium with ACIC came due but she was out of town because she is in the Army Reserves. She did not make her payment on time and the insurance company declined to renew her insurance when she sent the check late. Since she was required by her mortgage company to carry insurance, she called Miller. Plaintiff then stated:

Q.    Did you tell Darius [Miller] when you went to him that the reason you were coming is that your prior carrier would not continue your coverage in force?

A.    Yes, sir. I told him what happened. I knew you had to have insurance. I definitely told him I had to have insurance. Darius knowed exactly what happened. And Darius knowed about the shooting, too. Everybody in Newport knowed about it, half of East Tennessee, I believe. . . . I know I did tell him [that my previous insurance company] sent my check back. . . .

Q.    Okay. How many claims have you had for lightning striking your well?

A.    Well, two or three, I know. [One was] in the seventies. And then one or two times in that house, I know. And I

_____

[3] A complaint for personal injuries was filed against Plaintiff by the person she shot. The complaint was filed on May 15, 1995.

know for a fact about a year ago, maybe, here, in my house – this other house.

\* \* \*

Q. Now, let me ask you this. On January 29, 1997, did you present a claim to American Commerce Insurance Company for lightning damage and receive a payment?

A. I guess if it's wrote down I did.

Q. Did you report a claim to American Commerce Insurance Company on March 13, 1995?

A. I don't remember about that, now. If that would be for the well, I guess that would be.

State Farm also filed as an exhibit to its motion for summary judgment the deposition of Robert C. Seese ("Seese"), a regional claims manager for ACIC. Seese testified that ACIC insured Plaintiff's home beginning in December of 1991. According to Seese, Plaintiff filed a claim in November of 1994 with a date of loss being October 23, 1994. This claim surrounded Plaintiff shooting Everett Woody. Pursuant to Plaintiff's homeowner's policy, ACIC retained an attorney to represent her in the civil action brought against her for the shooting which eventually settled for $35,000. Seese also stated that there was a reported loss that occurred in March of 1995. Specifically, Plaintiff reported that the main drain going to the septic tank clogged causing water and sewage to back-up into the house. No payment was made because the amount of damage did not exceed the deductible. Seese further testified that Plaintiff made a claim for lightning damage on January 29, 1997, for which ACIC paid Plaintiff $515.

State Farm also filed the Affidavit of Reginald Daniel Sharley, Jr. ("Sharley"), who is employed by State Farm and who worked in the underwriting department when Plaintiff applied for insurance. According to Sharley:

It is difficult to make an educated decision about issuing a policy without accurate information about the applicant's prior loss history.

-9-

Information about an applicant's prior loss history is one of the most important factors in assessing the insurability of the applicant.

Information about an applicant's history with prior insurers is an essential part of determining an applicant's insurability.

In 1997, part of my job responsibilities included receiving applications for homeowner's insurance. In the course of my employment with State Farm as an underwriter, I reviewed the application for homeowner's insurance that was signed by [Plaintiff] on April 1, 1997. The application reflected that [Plaintiff] had not had any losses, insured or otherwise, within three (3) years prior to the application. The application also reflected that no insurer or agency had canceled, refused to issue or renew similar insurance to her or a household member within the past three (3) years.

I ultimately approved the application.

Based upon my experience and training, the fact that [Plaintiff's] prior carrier had paid out $35,000 as a result of a shooting incident involving [Plaintiff] which occurred within three (3) years prior to April 1, 1997 would have been material to the decision making process for issuing a homeowner's policy to her. I believe this prior loss would have increased the risk of loss.

Based upon my experience and training, the fact that [Plaintiff's] prior carrier paid out $515.00 for lightning damage pursuant to dwelling coverage for a loss which occurred within the three years prior to April 1, 1997 would have been material to the decision to issue a homeowner's policy to [Plaintiff]. I believe this prior loss would have increased the risk of loss.

Based upon my experience and training, the fact that [Plaintiff] had a property damage loss resulting from sewer backup into her home within three (3) years prior to April 1, 1997, would have been material in deciding whether to issue a

-10-

policy. I believe this prior loss would have increased the risk of loss.

Based upon my experience and training, the fact that [Plaintiff's] prior carrier refused to renew her homeowner's insurance would have affected my judgment in determining whether to insure [Plaintiff]. In fact, knowledge that her prior carrier refused to renew her policy after it had gone into lapse status for late payment would have been material to the decision to issue a homeowner's policy to [Plaintiff]. I believe this . . . would have increased the risk of loss.

All of the above losses should have been disclosed on the State Farm application for insurance submitted by [Plaintiff]. All of the above losses would have warranted further inquiries regarding [Plaintiff's] claim history, and the prior losses also increased the risk of loss. (original paragraph numbering omitted)

State Farm also filed the deposition of Michael William Leyshon ("Leyshon"), a Director of Underwriting for ACIC and who has worked for that company for 18 years. Leyshon testified that Plaintiff's insurance policy with ACIC lapsed after she failed to make a payment by the due date. The "actual cancellation of the policy was March 12th of 1997." Plaintiff called ACIC on March 31, 1997, and was advised that the policy was in lapse status and ACIC opted not to reinstate the policy at that time.

Plaintiff responded to Defendants' motion for summary judgment. Plaintiff also filed her own motion for summary judgment. In so doing, Plaintiff filed the affidavit of Billy Akin ("Akin"), a chartered property and casualty insurance underwriter. According to Akin, the fact that Plaintiff's prior insurance carrier paid Plaintiff $515 for a loss due to lightning damage should not be material in an underwriting decision regarding whether to insure Plaintiff. Akin also opined that the "trivial" sewage backup that occurred on March 13, 1995, should not be considered material in the underwriting decision. Tellingly, Akin never mentions the shooting or the payment of $35,000 to settle the lawsuit filed against Plaintiff by the person whom she shot. Akin also does not mention whether Plaintiff's allegedly failing to state on the application that a previous insurance carrier had refused to renew her insurance would be deemed material.

Plaintiff went to Miller's office after the fire and surreptitiously taped a conversation she had with him. In this conversation, Plaintiff again acknowledged that she

-11-

talked with Miller the night before signing the application, and the next morning "after I got off work and signed the papers and I didn't look at it or nothing. . . . I just signed it and went home. I wrote you a check. . . ." When she asked Miller if he remembered that, he said he did not remember exactly how it happened. Miller also stated that he did not know it was Plaintiff who was involved in the shooting, although he did recall hearing about the shooting. Miller acknowledged he did not recall asking Plaintiff about the shooting. Miller stated that he did not know of any fraud committed by Plaintiff "[b]ecause I asked you those questions, you answered them just like they were supposed to have been answered as far as I know." Miller told Plaintiff that he did not put anything on the application about the shooting because, at that time, he did not know she was involved. Miller specifically asked Plaintiff the following question: "You hadn't had any losses in three years . . . before we had written [the application for insurance], had you?" Plaintiff stated "No, I've not, and I told them." Miller acknowledged asking Plaintiff if her policy had been cancelled. Plaintiff told him it had not been cancelled, but that it had lapsed. Miller then stated "I'm sure we asked you these other questions but I let you look at it." Miller re-read Plaintiff a question about whether she had had any losses in the three years before filling out the application. Plaintiff responded "[n]o, not as I know of, not unless it might have been a well or something." Plaintiff eventually told Miller about the lawsuit filed against her based on the shooting. Miller responded by stating, "I didn't know that." He later stated, "I didn't even know a claim was filed on that shooting."

Plaintiff also filed Miller's deposition. Miller testified at his deposition that he currently works for State Farm and has worked as an insurance agent for forty-four years. Miller stated that he "bumped into" Plaintiff and she told him that her insurance had expired and she needed new insurance. Miller inspected Plaintiff's house and, thereafter, Plaintiff came to his office to complete the application. Miller stated that the insurance application was filled out in his office. He asked Plaintiff the questions, and he put the answers on the application. He then gave Plaintiff the application and told her to look it over and if it was accurate, to sign it.

As to the question on the application about any insurer cancelling or refusing to renew a policy of insurance, Miller stated that a policy simply expiring would not apply to that question. According to Miller, all Plaintiff told him was that she had failed to pay her premium on time. Plaintiff never told Miller about a previous fire loss. Miller stated that when he helped Plaintiff fill out the application, he was not aware that Plaintiff had been sued over the shooting and that Plaintiff never mentioned the lawsuit. Miller stated that he did not recall talking with Plaintiff about a small property damage claim involving lightning damage either before or after the application was filled out. He added that such a loss should be pointed out in the application. However, he also agreed that such a small property loss

claim would not affect the cost of the policy. Miller stated that he believed the application had been filled out correctly based on the information that he received.

Following a hearing on the respective motions for summary judgment, the Trial Court entered an order stating as follows:

> On November 12, 2004, the court heard arguments regarding the Motions for Summary Judgment filed by both the plaintiffs and defendants. After hearing argument from counsel, examining the pleadings and reviewing the file as a whole, the court determined that Cecilia Owensby did make a material misrepresentation on her application for insurance regarding a prior lightening loss. The court determined that the sewage back-up claim was not material as it did not increase the risk of loss to State Farm. The court held that the term "loss" as it was written in the application for insurance was too vague to encompass the prior shooting loss. Thus, the failure to acknowledge the prior shooting loss on the application for insurance was not a misrepresentation. The court held that the termination of Ms. Owensby's relationship with her former insurance carrier did not constitute a failure to renew and thus was not a misrepresentation. Because Cecilia Owensby's misrepresentation about the prior lightning loss did increase the risk of loss to State Farm, State Farm is entitled to summary judgment.
>
> The court determined that defendant Darius H. Miller was not entitled to Summary Judgment and the plaintiffs' case shall proceed against Darius H. Miller on the issue of his negligence in preparing the application for insurance.
>
> The court went on to address plaintiffs' Motion for Summary Judgment. The court determined the plaintiffs were not entitled to Summary Judgment as State Farm was not estopped from voiding the policy based on material misrepresentations on the application for insurance made by Cecilia Owensby. The court determined that the policy was renewed before the investigation of the Owensbys' claim had been completed and after a reservation of rights letter had been issued to the plaintiffs. Thus, State Farm was not estopped from

-13-

voiding the policy as a result of the material misrepresentation of Cecilia Owensby.  The Court also overruled the Plaintiffs' Motion for Summary Judgment on the issue of bad faith. . . .

Following entry of the above judgment, Miller filed a motion to amend the judgment asserting that his motion for summary judgment also should have been granted. Plaintiff filed another affidavit in opposition to the motion.  Based on the contents of this affidavit, Plaintiff suddenly remembered much more of the conversation she had with Miller when applying for the insurance.  In any event, Plaintiff stated that she remembered telling Miller that she thought the reason her prior insurer did not renew her policy was because of the shooting.  She stated:

> That he and I again discussed the circumstances surrounding my prior insurer refusing my late payment, and I was adamant that I believed that they were using the late payment as an excuse because of the shooting incident.  Mr. Miller, as it seemed the whole of Newport, was aware of the shooting and the lawsuit, as evidenced by his "teasing me" somewhat about it the next morning.

In her new affidavit, Plaintiff now remembered telling Miller about the lightning damage. However, Plaintiff continued not to remember other items, such as whether Miller discussed all of the questions on the application with her.  Plaintiff acknowledged looking at the application after it was filled out and before signing it.

After the parties submitted briefs and another hearing was conducted, the Trial Court entered an order granting Miller's motion for summary judgment.  According to the Trial Court:

> Upon reconsideration, the court held that the undisputed facts were that Cecilia Owensby was presented with the prepared application for insurance and that she signed the application.  In light of the court's prior ruling that, as a matter of law, the application for insurance contained a material misrepresentation, the court held that Cecilia Owensby was guilty of negligence for failing to accurately review the application prepared by Miller before she verified its accuracy by signing it.  The court rule[s] that the negligence of Cecilia Owensby barred recovery against Darius Miller.

-14-

Plaintiff appeals claiming: (1) that the Trial Court erred when it determined that the undisputed material facts established that Plaintiff had made a material misrepresentation on the application for insurance; (2) that the Trial Court erred when it determined that the alleged misrepresentation increased the risk of loss; (3) that the Trial Court erred when it determined that Plaintiff had committed "gross negligence," thus barring any claim against Miller; and (4) that State Farm had waived its right to void the policy based upon any alleged misrepresentations.

Defendants argue on appeal that although the Trial Court correctly granted their motion for summary judgment, the Trial Court should have found four material misrepresentations and that each of the four misrepresentations increased the risk of loss.

## Discussion

Our Supreme Court reiterated the standard of review in summary judgment cases as follows:

> The scope of review of a grant of summary judgment is well established. Because our inquiry involves a question of law, no presumption of correctness attaches to the judgment, and our task is to review the record to determine whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Cowden v. Sovran Bank/Cent. S.*, 816 S.W.2d 741, 744 (Tenn. 1991).

> A summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993). The party seeking the summary judgment has the ultimate burden of persuasion "that there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." *Id*. at 215. If that motion is properly supported, the burden to establish a genuine issue of material fact shifts to the non-moving party. In order to shift the burden, the movant must either affirmatively negate an essential element of the nonmovant's claim or demonstrate that the nonmoving party cannot establish an essential element of his case. *Id*. at 215 n.5; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8-9 (Tenn. 2008).

"[C]onclusory assertion[s]" are not sufficient to shift the burden to the non-moving party. *Byrd*, 847 S.W.2d at 215; *see also Blanchard v. Kellum*, 975 S.W.2d 522, 525 (Tenn. 1998). Our state does not apply the federal standard for summary judgment. The standard established in *McCarley v. West Quality Food Service*, 960 S.W.2d 585, 588 (Tenn. 1998), sets out, in the words of one authority, "a reasonable, predictable summary judgment jurisprudence for our state." Judy M. Cornett, *The Legacy of Byrd v. Hall: Gossiping About Summary Judgment in Tennessee*, 69 Tenn. L. Rev. 175, 220 (2001).

Courts must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). A grant of summary judgment is appropriate only when the facts and the reasonable inferences from those facts would permit a reasonable person to reach only one conclusion. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). In making that assessment, this Court must discard all countervailing evidence. *Byrd*, 847 S.W.2d at 210-11. Recently, this Court confirmed these principles in *Hannan*.

*Giggers v. Memphis Housing Authority*, 277 S.W.3d 359, 363-64 (Tenn. 2009).

Plaintiff's contract of insurance with State Farm contains the following declarations:

We agree to provide the insurance described in this policy:

1.      based on your payment of premium for the coverages you chose;

2.      based on your compliance with all applicable provisions of this policy; and

3.      in reliance on your statements in these Declarations.

You agree, by acceptance of this policy, that:

1.    you will pay premiums when due and comply with the provisions of the policy;

2.    the statements in these Declarations are your statements and are true;

3.    we insure you on the basis your statements are true; and

4.    this policy contains all of the agreements between you and us and any of our agents.

Unless otherwise indicated in the application, you state that during the three years preceding the time of your application for this insurance your Loss History and Insurance History are as follows:

1.    Loss History: you have not had any losses, insured or not; and

2.    Insurance History: you have not had any insurer or agency cancel or refuse to issue or renew similar insurance to you or any household member.

\*   \*   \*

SECTION I AND SECTION II – CONDITIONS

\*   \*   \*

2.    Concealment of Fraud.  This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstances relating to this insurance, whether before or after a loss.

Also relevant to this appeal is Tenn. Code Ann. § 56-7-103 which provides as follows:

-17-

No written or oral misrepresentation or warranty made in the negotiations of a contract or policy of insurance, or in the application for contract or policy of insurance, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless the misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

This Court was confronted with similar facts in *Tennessee Farmers Mut. Ins. Co. v. Farrar*, No. E2008-00779-COA-R3-CV, 2009 WL 1162603 (Tenn. Ct. App. Apr. 30, 2009), *no appl. perm. appeal filed*. In *Farrar*, the insured's claim was denied by the insurance company because of an alleged misrepresentation in the application for insurance. As in the present case, the insured testified that the insurance agent was told the correct information, but failed to properly fill out the application prior to it being signed by the insured. As a result, the insured argued that the insurance company was estopped from relying on a misrepresentation defense. We disagreed, stating as follows:

> The Claimant argues that Tennessee Farmers should be estopped from asserting the non-disclosure of the life estate on the application. He relies upon *Molloy v. City of Chattanooga*, 191 Tenn. 173, 232 S.W.2d 24 (1950). "[T]he 'vital principle' of [the] doctrine [of equitable estoppel] is that 'he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted.'" *Id*. at 26 (quoting *Saylor v. Trotter*, 148 Tenn. 359, 367-68, 255 S.W. 590, 593 (1923)). The trial court held, on this point, as follows:

>> The burden of proving the agent for [the Company] misled Mr. Farrar in giving an incorrect answer would be on Mr. Farrar. And I think based upon the proof that is presented to me or has been presented to me, that he's not met this burden. Essentially it's his word against Mr. Dyer's, plus the written application.

> The Claimant argues that the trial court erred in holding that he had the burden of proof. He argues that the burden of proof of a misrepresentation defense is on the insurer. *See, e.g.,*

-18-

*McDaniel*, 621 S.W.2d at 393 (citing *Womack v. Blue Cross and Blue Shield*, 593 S.W.2d 294, 295 (Tenn. 1980)). We agree that the Company had the burden of showing there was a misrepresentation in the application, but the burden of proving an affirmative defense is on the party asserting it. *Assoc. of Owners of Regency Park Condos. v. Thomasson*, 878 S.W.2d 560, 566 (Tenn. Ct. App. 1994) (citing 11 Tenn. Jur. *Evidence* § 50 (1984)). The trial court correctly placed the burden of proof of the affirmative defense of estoppel on the Claimant, and we do not find that the evidence preponderates against the court's factual determination that he did not carry his burden. Our decision is made stronger when viewed in the light of the case of *Giles v. Allstate Ins. Co., Inc.*, 871 S.W.2d 154 (Tenn. Ct. App. 1993). In *Giles*, Allstate asserted that when Ms. Giles signed an application for homeowners' insurance she failed to disclose that she had sustained a previous fire loss and that the insurance company had refused to renew her policy. *Id*. at 155. Ms. Giles claimed she told the insurance agent these facts, and he claimed she did not. *Id*. The trial court resolved the issue in favor of Ms. Giles, but held that its finding was not controlling because Ms. Giles had signed an incorrect application. *Id*. at 155-56. Ms. Giles claimed that the agent wrote down incorrect answers and that she should not be denied coverage because she signed the application without reading it. *Id*. This Court said:

> The same issue has been before the courts in this jurisdiction in numerous cases and they have consistently held: "That if, without being the victim of fraud [the insured] fails to read the contract or otherwise to learn its contents, he signs the same at his peril and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence."

*Id*. at 156 (citing *Beasley v. Metro. Life Ins. Co.*, 190 Tenn. 227, 232- 33, 229 S.W.2d 146, 148 (1950)). *Also see De Ford v. Nat'l Life & Accident Ins. Co.*, 182 Tenn. 255, 265, 185 S.W.2d 617, 621 (1945); *Hardin v. Combined Ins. Co.*, 528 S.W.2d 31, 37 (Tenn. Ct. App. 1975); *Montgomery v. Reserve Life Ins.*, 585

S.W.2d 620, 622 (Tenn. Ct. App. 1979). The *Giles* court explained further, saying,

> To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts.

> * * *

> It will not do, for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law.

*Giles*, 871 S.W.2d at 157 (citations and quotations omitted). *Giles* has been extensively cited. *See*, *e.g.*, *Reno v. Suntrust, Inc.*, No. E2006-01641-COA-R3-CV, 2007 WL 907256, at *3 (Tenn. Ct. App. E.S., filed March 26, 2007); *Staubach Retail Services-Southeast, LLC, v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 525 (Tenn. 2005).

In this case the Claimant testified that he signed the insurance application. He said, "I read over it briefly, probably not as well as I should've. But I read – I read and saw that all the blanks were filled in." Later when asked if he looked at the question in dispute, he said, "I didn't specifically just look at that question. I just – I didn't reread every question in the thing before I signed it. I just looked and saw that all the blanks were filled in." In this case the application also contained an acknowledgment above the signature line that provides: "I (We) have read all of the above page of this application and the 'Applicant's Additional Remarks Form' (if used), and acknowledge that they supersede all informal understandings or oral agreements relating to this offer to purchase insurance." When asked if he read the acknowledgment, the Claimant said, "I probably read it but I didn't – I just didn't note it."

In this case, the Claimant did not read the application before signing it, except to see that all the blanks were filled in. Furthermore, he admits that he did read the acknowledgment which states that he read the application and acknowledges that the application supersedes all informal understandings or oral agreements. We thus hold that the Claimant's signature binds him as a matter of law to the representations in the signed document and he may not now attempt to rely upon alleged oral statements to or by the insurance agent to avoid the effects of his own negligent failure to read the application. *See Beasley*, 190 Tenn. at 232-33, 229 S.W.2d at 148. We affirm the trial court's dismissal of the Claimant's counterclaim.

*Farrar*, 2009 WL 1162603, at *6-8.

We first will discuss the shooting incident. The application for insurance asked Plaintiff: "Has the applicant had any losses, insured or not, in the past 3 years?" Plaintiff responded "No". The Trial Court determined that the term "'loss' as it was written in the application for insurance was too vague to encompass the prior shooting loss." Plaintiffs also argue that the policy is ambiguous. As we stated in *Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693 (Tenn. Ct. App. 2005):

This Court's initial task in construing the Contract at issue is to determine whether the language of the contract is ambiguous. *Planters Gin Co.*, 78 S.W.3d at 890. If the language is clear and unambiguous, the literal meaning of the language controls the outcome of the dispute. *Id*. A contract is ambiguous only when its meaning is uncertain and may fairly be understood in more than one way. *Id*. (emphasis added). If the contract is found to be ambiguous, we then apply established rules of construction to determine the intent of the parties. *Id*. Only if ambiguity remains after applying the pertinent rules of construction does the legal meaning of the contract become a question of fact. *Id*.

*Kafozi*, 184 S.W.3d at 698-99.

We conclude that the policy language at issue is neither vague nor ambiguous. Plaintiff shot a person, she was prosecuted criminally, a civil lawsuit for damages was filed against her, Plaintiff's homeowners insurance carrier retained an attorney to represent her,

and the civil lawsuit was settled for $35,000, which was paid by Plaintiff's insurance company. If this does not constitute a "loss" for purposes of the question on the application, we do not know what would constitute such a loss. It is inescapable that the shooting and attendant civil lawsuit settled by a payment of $35,000 constituted a loss as that term is used in the policy.

In the present case, as in *Farrar*, the applicant, at best, simply failed to take the time to read the application and responses. Miller testified that he did not know about the civil lawsuit when the application was filled out. Plaintiff stated only that she mentioned the shooting and/or she assumed he knew about the shooting because everyone in Newport was aware it happened. Simply because Miller may have been aware in general terms that a shooting took place does not mean that he was aware that Plaintiff was sued and that her insurance company paid $35,000 to settle a civil lawsuit. There is nothing in the record that creates a genuine issue of material fact as to whether Miller knew about the civil lawsuit and nevertheless told Plaintiff that the civil lawsuit and resulting settlement did not constitute a loss under the policy. It is undisputed that Plaintiff never told Miller about the civil lawsuit and resulting settlement and that she did not disclose it on her application. Accordingly, Plaintiff is bound by the responses on the application and she cannot "attempt to rely upon alleged oral statements to or by the insurance agent to avoid the effects of [her] own negligent failure to read the application." *Farrar*, 2009 WL 1162603, at *8 (citing *Beasley*, 190 Tenn. at 232-33, 229 S.W.2d at 148).

The undisputed material facts further establish that the prior loss which Plaintiff misrepresented, i.e. the shooting and civil lawsuit, increased State Farm's risk of loss. While the shooting, standing alone, may not have increased the risk of loss, it goes without saying that being sued for shooting someone coupled with a $35,000 settlement of that lawsuit would increase an insurance company's risk of loss. State Farm's expert testified that its risk of loss was increased by this misrepresentation, and Plaintiff presented no proof to the contrary.

We reverse the Trial Court's judgment that the insurance policy is vague with respect to whether the shooting and attendant civil lawsuit and $35,000 settlement would be a loss as that term is used on the insurance application. We conclude that Plaintiff's failure to state on the application that there was a prior loss within the past three years as a result of the shooting and civil lawsuit constituted a misrepresentation and that this misrepresentation increased State Farm's risk of loss. Due to this holding, we pretermit whether the three other alleged misrepresentations were actual misrepresentations that increased State Farm's risk of loss.

The only remaining issue that is not pretermitted is whether State Farm waived its right to assert a misrepresentation defense by renewing Plaintiff's insurance policy after the claim had been made for the fire loss. The fire occurred on November 29, 1999. Plaintiff was sent a reservation of rights letter on December 22, 1999. Both Mr. and Ms. Owensby provided an examination under oath on January 13, 2000. The transcripts from the examinations under oath were forwarded to the Owensbys for their review and signature. In the meantime, the policy came up for renewal and the Owensby's were sent a renewal notice on February 16, 2000. There still were insurable buildings on the property and the renewal covered the remaining property. Ms. Owensby signed her transcript on February 24, 2000. Mr. Owensby, however, refused to sign the transcript of his examination under oath until he could compare the transcript to the tape recording. Mr. Owensby executed an affidavit acknowledging the accuracy of the transcript on March 14, 2000. Once State Farm received the signed transcripts, a decision was made in May 2000 to deny the claim. All insurance premiums were returned to Plaintiff.

The reservation of rights letter sent to Plaintiff on December 22, 1999, states that:

> There is a question as to whether this Company is obligated under the policy for a loss which occurred on or about November 29, 1999 . . . because:
>
> > There is a question as to whether there was a material misrepresentation on your application for insurance with State Farm . . . .
>
> For this reason, you are hereby notified that any action taken by the State Farm Fire and Casualty Company or its authorized representatives to investigate the cause of loss, determine the amount of loss or damage, or attempt to adjust any claim arising out of the alleged loss shall not waive any of the terms or conditions of the policy of insurance described above. If we do not hear from you to the contrary, we will assume that it is acceptable for us to continue handling the case on these terms.
>
> The Company does not intend, by this letter, to waive any policy defenses in addition to those stated above, but specifically reserves its right to assert such additional policy defenses at any time.

This will advise you we are continuing to investigate the loss referred to above. At this time, we have not determined whether your claim should be paid.

Based on the clear language of the reservation of rights letter and because the investigation into the claim was continuing, State Farm did not waive its right to assert a misrepresentation defense because it renewed the policy which came due in the middle of the investigation. We also note that to hold otherwise would require insurance companies not to renew a policy if they are investigating the validity of a claim because otherwise the renewal would result in a waiver of potential defenses to the claim no matter what the reservation of rights letter said. Accordingly, we reject Plaintiff's argument that State Farm waived its right to assert a misrepresentation defense.

The Trial Court's judgment granting Defendants' motion for summary judgment is affirmed as modified.

## Conclusion

The judgment of the Trial Court is affirmed as modified, and this cause is remanded to the Cocke County Circuit Court for collection of the costs below. Costs on appeal are taxed to the Appellants, Cecilia and Charles Owensby, and their surety, for which execution may issue, if necessary.

_____
D. MICHAEL SWINEY, JUDGE